[No. B016491. Second Dist., Div. Three. Sept. 24, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD JOSEPH MAESTAS, Defendant and Appellant.

COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, Jill Ishida and Nancy Ann Stoner, Deputy Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Susanne C. Wylie and Renee Laurents, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARABIAN, J.—

### INTRODUCTION

Defendant and appellant Donald Joseph Maestas appeals from the judgment entered following a court trial in which he was found guilty of second degree murder (Pen. Code, § 187). Appellant was sentenced to 15 years to life and ordered housed in the Youth Authority until the appropriate age, and then transferred to state prison to complete his sentence. The court imposed a $3,000 restitution fine pursuant to Penal Code section 1203.04. Appellant contends: "I. The prosecution's use of appellant's coerced and involuntary statements to the police requires reversal of his conviction. . . . II. The continuation of the interrogations, despite appellant's and his mother's requests to speak with each other, violated appellant's right against self-incrimination and requires reversal of the resulting conviction. III. The restitution fine was improperly imposed and must be stricken." We affirm the conviction and strike the restitution fine.

### FACTUAL AND PROCEDURAL BACKGROUND

At 1 a.m. on January 28, 1983, Ricardo and Virginia Sanchez were awakened by loud knocks on the door of the bedroom where they and their three children lay sleeping. The door was broken by the blows, and Mr. and Mrs. Sanchez saw two young men, about 20 years old, standing in the light from the bedroom next door. One of them, later identified as Carlos Octavio Jimenez, held a gun. He asked twice if Jose was in, and Mr. Sanchez each time responded that no one named Jose lived there.

The other man, identified as appellant, said nothing and went out through the front door. The gunman went to the living room where he looked all around, then left. Mr. Sanchez went to the kitchen and as he returned to the living room with a knife, there was a knock at the door. He put the knife behind some furniture and went to the door. When he opened it, he was shot in the abdomen. Mrs. Sanchez went to the door and saw the gunman fleeing. Mr. Sanchez died 10 minutes later.

Ballistics tests confirmed that the bullet removed from Mr. Sanchez's body was fired by a handgun belonging to Mrs. Martha Mankiller, appellant's grandmother. Appellant resided with his grandmother and mother, Lanita Maestas, in a home directly behind the Sanchez's residence. Mr. Jiminez visited appellant and his mother there often.

Appellant was arrested and taken into custody at approximately 4:30 p.m. on March 3, 1983. He was transported to the Foothill station where, after advisement and waiver of his *Miranda*[1] rights, he was interrogated, commencing at about 5 p.m. Appellant denied any knowledge and claimed he only heard of the crime through his little brother. At approximately 5:30 p.m., appellant was transported to headquarters in downtown Los Angeles to undergo a polygraph examination, which he had agreed to undergo. The ride took 30 to 45 minutes each way. Appellant received *Miranda* advisements before the polygraph examination and again waived his rights. After the examination, he was transported back to the Foothill station at 11:30 p.m., and interrogation of appellant did not continue until after midnight. Appellant was informed that the polygraph examination indicated that he was not telling the truth when he again stated he knew nothing about the murder.

During this third interview, appellant confessed to his involvement. He explained that about a month earlier someone at the Sanchez house had attacked appellant's mother. All of appellant's friends loved and respected his mother. Appellant claimed that they wanted to wound but not kill the

---

[1] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

man who assaulted her. Appellant admitted he was present during the crime but refused to identify the gunman.

The trials of appellant and Jimenez were held separately. However, the evidence was heard jointly except that the court stated it would consider the confession of each defendant against the declarant only. The court denied appellant's motions to exclude his confession (Evid. Code, §§ 402-405) and to suppress evidence (Pen. Code, § 1538.5).[2] The court granted in part and denied in part appellant's motions to excise portions of the tapes and transcribed statements, excising those portions which referred to gangs, prior crimes, appellant's polygraph examination, and hearsay from an informant.

At trial, appellant's statements were admitted, and appellant was found guilty of murder in the second degree.

## DISCUSSION

### I. *Standard of Review*

■ Before a confession can be used against a defendant, the prosecution has the burden of proving that it was voluntary and was not the result of any form of compulsion or promise of reward.

■ It is this court's duty "to examine the entire record and make an independent determination of the ultimate issue of voluntariness." (*Davis* v. *North Carolina* (1966) 384 U.S. 737, 741-742 [16 L.Ed.2d 895, 898, 86 S.Ct. 1761].)

" ' "[I]t is our duty to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found. . . . In exercising this function the court recognizes that the burden is on the prosecution to show that a confession was voluntarily given without previous inducement, intimidation or threat. . . . [Citations.]" '. . . . . With respect to conflicting testimony, of course, '. . . we accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' " (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672], citations omitted.)

---

[2]For purposes of the pretrial motions, the entire transcript of his taped statements to the police was admitted. The trial court also took judicial notice of the preliminary hearing transcript. Appellant's motions to exclude the tapes as evidence at trial and to have appellant's statements stricken after the court listened to the tapes were denied.

## II. *Appellant's Contention That His Statements Were Coerced and Involuntary Is Meritless.*

### A. *The Alleged "Coercive Environment."*

Appellant contends that, "Through isolation, relentless interviews, no breaks for food or phone calls the officers maximized the coercive environment until appellant finally confessed." However, the totality of circumstances in the instant case does not rise to a violation of appellant's rights and does not render his inculpatory statements inadmissible.

First, appellant was advised of his *Miranda* rights on three separate occasions: at the beginning of the initial interrogation at the Foothill station, before he took the polygraph examination, and again upon the resumption of his interrogation back at the Foothill station. There is nothing in the record to suggest that he did not understand his rights or that his waiver of those rights was not voluntary. Although he was in custody for more than seven and one-half hours before he finally admitted his involvement in the murder, he was not interrogated during a significant portion of this time, when he was being transported to and from the downtown headquarters and during the long delay in commencing the polygraph examination, 5:30 p.m. until 9 or 9:30 p.m. (The polygraph examination was delayed because the examiner was at home and had to be summoned.) Appellant voluntarily agreed to take the polygraph examination, apparently in an attempt to deceive the police further.

Appellant contends that he and his mother "were kept isolated from each other until statements were obtained."[3] The record reveals that appellant did not request to talk to his mother until the police asked him if he wanted to make a phone call, when the interrogation resumed back at the Foothill station. He responded by asking if he could call "[his] girlfriend and [his] mom." When he was told he could talk to his mother "now" he agreed to talk further with the police officer first.

Appellant also suggests that "the intentional or inadvertent disregard for appellant's nutritional needs" contributed to "the coercive environment," and the "reward of a burrito and coke after appellant finally started to inculpate himself was an effective method of softening him up and obtaining further damaging information." We find this factor is insignificant under the circumstances, and does not rise to the level of coercion found in *Davis v. North Carolina, supra,* 384 U.S. 737, 746 [16 L.Ed.2d 895, 901, 86 S.Ct.

---

[3] Appellant's contention that the denial of his mother's request to see him violated his right against self-incrimination is discussed in part III of this opinion.

1761], cited by appellant, in which the defendant lost 15 pounds while being held in isolation for 16 days.

### B. *Alleged Threats and Inducements.*

 Appellant contends that the police officers "mixed religious exhortations with a morbid reference to appellant's father who was stabbed in San Quentin and insured that the fearsome sting was felt by repeatedly indicating that appellant might be certified to adult court and sent to state prison unless he talked."

 "[I]n carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession. It is apparent that when the police interview a suspect, they must skate a fine line. . . . They are authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise." (*People* v. *Andersen* (1980) 101 Cal.App.3d 563, 576 [161 Cal.Rptr. 707].)

 We find the police did not cross the line into impermissible behavior. The information provided appellant did not amount to trickery or dishonesty, but an attempt to describe appellant's real situation.

Appellant argues that the officers used the possibility of release as an inducement to speak to the polygraph examiner. This is not dishonesty or trickery. It is clear that, in this case, if the polygraph examination showed that appellant was indeed telling the truth when he denied any involvement or knowledge of the murder, release would have been likely.

Appellant argues that the officers played on appellant's fear of imprisonment by referring to his father's death while in prison and pressured him to confess by repeated references to religion and appellant's Catholic beliefs. Such references were brief and suggestive that appellant tell the truth. " 'When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made." (*People* v. *Jimenez, supra,* 21 Cal.3d 595, 611-612, quoting *People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].)

Appellant also contends that the police broke appellant's resistance through "promises of leniency and threats that appellant would face harsher charges and penalties if he did not confess." A careful review of the transcripts of the interrogation reveals that the gist of the comments cited

by appellant was not that he would be punished for not confessing but that his concealment of the identity of the person who shot the victim tended to reflect negatively on the extent of his involvement. The comments explain the possible consequences, depending upon his motivations and involvement in the shooting, and as such do not constitute "threats" or "false promises of leniency."[4] " 'It is settled that admonitions to tell the truth do not amount to coercion'; nor do 'assertions that one is better off telling the truth' constitute false promises of leniency." (*People* v. *Seaton* (1983) 146 Cal.App.3d 67, 74 [194 Cal.Rptr. 33], quoting *People* v. *Andersen, supra,* 101 Cal.App.3d 563, 578-579.)

Although the officer erred when he stated that Youth Authority time would be a maximum of four years, the police made no promise that he would be sent to the Youth Authority or what kind of sentence he would receive, stating at one point, "I don't know I'm not a judge."

### C. *The Admission of Appellant's Confession Does Not Require Reversal.*

 Appellant contends that the prosecution's use of appellant's statements requires reversal, that without the confession the remaining evidence was too weak for a conviction. The trial judge considered all of the evidence in the case and assessed the credibility of the eye witness, Mrs. Sanchez, who identified appellant as one of the men present during the murder, and the two officers who interrogated appellant. In light of the fact that he stated that there was no reasonable doubt in his mind, as the trier of fact, "none, even without the confession," that appellant was guilty of murder, any possible error in the admission of appellant's confession must be deemed harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

### III. *Appellant's Contention That the Continuation of the Interrogations, Despite Appellant's and His Mother's Requests to Speak With Each Other, Violated Appellant's Right Against Self-Incrimination Is Meritless.*

 Appellant's mother requested to see her son before the interrogations began and her request was denied. Appellant asked to speak to his mother, only later, when asked if he wanted to make any telephone calls.[5]

---

[4] Although the officers may have misstated the law regarding criminal culpability in some respects, the factors they mentioned are taken into consideration at sentencing. (Pen. Code, § 1170; Cal. Rules of Court, rules 421, 423.)

[5] The record indicates that the police did not inform appellant of his right to make telephone calls.

Appellant responded by asking if he could call "[his] girlfriend and [his] mom," but then agreed to answer more questions first. Later, when he was told he was going to juvenile hall that night, he asked, "Can I call my mom?" The officer responded, "Yea one minute I'll get on the line." Later, the officer said he would "probably call his mom, have her come down talk to him," and shortly thereafter appellant spoke with her in person. Both interrogating officers knew appellant's mother was present at the station.[6]

Appellant contends that the police are under a duty to advise the minor of his right to talk with his parents before interrogation can take place, when *either* the defendant or the parent requests communication with the other. This contention does not accurately state the law or fit the facts of this case.

■ The admissibility of a confession depends upon the totality of the circumstances existing at the time the confession was obtained. (*People* v. *Robertson* (1982) 33 Cal.3d 21, 39-40 [188 Cal.Rptr. 77, 655 P.2d 279]; *People* v. *Sanchez* (1969) 70 Cal.2d 562, 572 [75 Cal.Rptr. 642, 451 P.2d 74] cert. dism., *Sanchez* v. *California* (1969) 394 U.S. 1025 [23 L.Ed.2d 743, 89 S.Ct. 1646].) ■ A minor can effectively waive his constitutional rights (*People* v. *Lara* (1967) 67 Cal.2d 365, 390-391 [62 Cal.Rptr. 586, 432 P.2d 202], cert. den. *Lara* v. *California* (1968) 392 U.S. 945 [20 L.Ed.2d 1407, 88 S.Ct. 2303], cert. den. (1968) *Lara* v. *California* (1968) 392 U.S. 945 [20 L.Ed.2d 1407, 88 S.Ct. 2303]),[7] but age, intelligence, education and ability to comprehend the meaning and effect of his confession are factors in that totality of circumstances to be weighed along with other circumstances in determining whether the confession was a product of free will and an intelligent waiver of the minor's Fifth Amendment rights (*id.,* at pp. 385-387).

In *People* v. *Lara, supra,* 67 Cal.2d at page 383, the Supreme Court gave guidance as follows: "[A] minor has the capacity to make a voluntary confession, even of capital offenses, without the presence or consent of

---

[6] At trial, one of the two interrogating officers testified that he was aware that appellant's mother was present at the station during the interview with appellant, but that she never asked to speak to appellant.

[7] Minors in California have substantial standing in conducting their affairs both under federal and state guarantees. For example, a state may not condition a minor's decision to have an abortion on parental consent (*Planned Parenthood of Missouri* v. *Danforth* (1976) 428 U.S. 52 [49 L.Ed.2d 788, 96 S.Ct. 2831]; nor may it because of youth restrict one's access to contraceptives (*Carey* v. *Population Services International* (1977) 431 U.S, 678 [52 L.Ed.2d 675, 97 S.Ct. 2010]). It is established that minors have a liberty interest that entitles them to due process whenever a state initiates action to deprive them of liberty. (*In re Gault* (1967) 387 U.S. 1, 13 [18 L.Ed.2d 527, 538, 87 S.Ct. 1428].)

counsel or other responsible adult, and the admissibility of such a confession depends not on his age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement."

■ Appellant's contention is not supported by California Supreme Court decisions. *People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793], did not establish a requirement of a parental advisement. *Burton* held that a minor's confession was unlawfully obtained after his invocation of Fifth Amendment rights by requesting to see his parents and having that request denied. (*Id.,* at pp. 383-384.) Those are not the facts here.

Appellant did not request to speak to his mother until after the polygraph examination and the commencement of the third interview, when he was asked if he wished to make some telephone calls. His response, mentioning his girlfriend first, suggests that he wished to make telephone calls to let them know what was happening or to seek comfort, not for advice regarding his arrest and interrogation. Although he had discussed his mother during the interviews, he had not asked to see her or to speak with her. He never gave an indication that he wanted the interrogation to cease. He voluntarily waived his *Miranda* rights. There is no indication, as in *People* v. *Burton, supra,* 6 Cal.3d 375, that appellant's request to see his mother, must "be construed to indicate that the minor suspect desire[d] to invoke his Fifth Amendment privilege." (*Id.,* at p. 384.) As explained in *People* v. *Rivera* (1985) 41 Cal.3d 388, 394-395, "The reference to 'evidence demanding a contrary conclusion' in *Burton* recognized the possibility that in some cases the juvenile's own request might make it clear that he did not wish to speak to his parents for advice in responding to the police questioning, but rather had some other, unrelated purpose in mind . . . ." This is such a case.

Nor did the failure of the police to advise appellant of his right to see his mother violate appellant's rights. Appellant erroneously contends that even absent his request, upon his mother's request to see him, the police were under a duty to advise him of his right to see her before interrogation took place.

We are aware of *In re Patrick W.* (1980) 104 Cal.App.3d 615 [163 Cal.Rptr. 848] certiorari denied, *California* v. *Patrick W.* (1981) 449 U.S. 1096 [66 L.Ed.2d 824, 102 S.Ct. 893], which held that even *absent a request,* if grandparents are available and wish to speak to a minor in custody, police are *under a duty* to advise the minor of his right to see them before interrogation can take place.[8]

---

[8] *In re Jessie* (1982) 131 Cal.App.3d 202, 215 [182 Cal.Rptr. 396]; *In re Abdul Y.* (1982) 130 Cal.App.3d 847, 865 [182 Cal.Rptr. 146]; and *In re Anthony J.* (1980) 107 Cal.App.3d

However, in *People* v. *Lara, supra,* 67 Cal.2d at pp. 378-379, the leading case on this subject, the Supreme Court stated: "We cannot accept the suggestion of certain commentators (see 7 Santa Clara Law. 114, 127 (1966); 40 Wash.L.Rev. 189, 200-201 (1965)) that every minor is incompetent as a matter of law to waive his constitutional rights to remain silent and to an attorney unless the waiver is consented to by an attorney or by a parent or guardian who has himself been advised of the minor's rights. Such adult consent is of course to be desired, and should be obtained whenever feasible. But as we will explain, whether a minor knowingly and intelligently waived these rights is a question of fact; and a mere failure of the authorities to seek the additional consent of an adult cannot be held to outweigh, in any given instance, an evidentially supported finding that such a waiver was actually made."

Additionally, the *Lara* court held: "To sum up, we have seen that a minor . . . does not lack the capacity as a matter of law to make a voluntary confession without the presence or consent of counsel or other responsible adult, . . . the issue is one of fact, to be decided on the 'totality of the circumstances' of each case." (*Id.,* at p. 389.)[9]

As required, we have applied our independent review under the "totality of circumstances" test and have strictly scrutinized the record. The determination of the trial court on this issue will not be disturbed unless it is palpably erroneous. (*In re Anthony J., supra,* 107 Cal.App.3d 962, 972.)

Failure to seek the consent of appellant's mother, under the circumstances here, cannot be found to outweigh an evidentially supported judicial finding that a proper waiver was made. (*Id.,* at p. 974.) Appellant, age 16, who had been arrested on previous occasions and had been placed in juvenile hall, was familiar with police procedures. The record abundantly supports the trial court's finding that appellant's confession was freely and voluntarily made after a knowing and intelligent waiver of his rights.

---

962, 974 [166 Cal.Rptr. 238], cited by appellant, do not stand for the principle stated in *In re Patrick W.* Each is distinguishable on its facts.

[9] Apparently, the *Lara* concept of *feasibility* was raised to the level of a *duty* under the *Patrick W.* reasoning. Since the Legislature has never enacted such a requirement, we can well understand the reluctance of other intermediate courts to follow its holding. However, rather than ignore it, we choose to posit that the perceived duty in *Patrick W.* is not the law of California.

Nor does *People* v. *Houston* (1986) 42 Cal.3d 595 [230 Cal.Rptr. 141, 724 P.2d 1166], in which the Supreme Court held that a defendant cannot be held incommunicado and deprived of the knowledge that his attorney was attempting to see him, compel a different result here. We find that the parental role does not equate with the attorney's role in an interrogation by police.

## IV. *The Restitution Fine Was Improperly Imposed.*

 After sentencing appellant, the trial court ordered appellant to pay a $3,000 restitution fine pursuant to Penal Code section 1203.04. Because that section authorizes a fine only as a condition of probation, it is inapplicable to appellant. Nor is the fine proper pursuant to Penal Code section 1202.4, which did not become operative until January 1, 1984, (Stats. 1983, ch. 1092, §§ 426-427) and does not apply to offenses committed before that date (*People* v. *Downing* (1985) 174 Cal.App.3d 667, 672 [220 Cal.Rptr. 225]), nor pursuant to Government Code section 13967, which required, at the time appellant committed the offense, a finding that the defendant had the present ability to pay a fine, since no such finding was made.

### DISPOSITION

The judgment is affirmed in all respects except that the restitution order is stricken.

Klein, P. J., and Danielson, J., concurred.

A petition for a rehearing was denied October 22, 1987, and appellant's petition for review by the Supreme Court was denied December 17, 1987.