[No. A050778. First Dist., Div. Five. Nov. 22, 1991.]

In re AVEN S., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
AVEN S., Defendant and Appellant.

### COUNSEL

Deborah Tuttelman, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald E. Niver and Don Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**LOW, P. J.**—In this case we consider and reject a minor's claim that the voluntariness of his confession should have been evaluated under a fundamentally different standard of proof than is applicable to adult criminal

defendants. We hold that in juvenile cases, as in prosecutions of adults, the People need only prove voluntariness by a preponderance of the evidence.

Aven S., age 15 at the time of his confession, appeals from a jurisdictional order declaring him to be a ward of the juvenile court (Welf. & Inst. Code, § 602) based upon findings that he had committed murder, residential robbery, attempted murder and assault (Pen. Code, §§ 187, 212.5, 245, 664), and from the dispositional order which followed. We affirm.

Manuel Uribe was shot in the head by a person who had ostensibly come to his apartment to buy marijuana from him, and some of his marijuana was taken. John Ferguson, Sr., heard a gunshot, then saw two young men come out of the building. One, whom he identified as the minor, was tucking what appeared to be a black handgun into his waistband. Ferguson turned his back and ran, heard a gunshot, and found he had been shot in the hand.

In his tape-recorded statement to the police, the minor stated that he and two others decided to rob Uribe. The minor, armed with a handgun, stood guard outside the apartment door while the other two went in. When he heard a shot he looked in, and saw Uribe bending down. He shot at Uribe once but did not know if he hit him or not. All three then fled in their car.

Oakland Police Sergeant Chenault testified to the circumstances of the station house confession. On January 17, 1990, Chenault sought a warrant for the minor's arrest. He then learned that the minor was already in custody on an unrelated matter, but was scheduled to be released soon on home supervision. Chenault asked the district attorney's office how he should go about interviewing the minor, and was told to wait until the minor was out of custody on the unrelated matter. On Friday, January 19, Chenault telephoned the minor's mother and told her he wanted to speak with the minor regarding a murder investigation. She said the minor would probably be released over the weekend and she would bring him in on Monday.

The minor and his mother arrived at the police station about 11 a.m. on Monday, January 22. Chenault took the minor to an interview room. A key is required to open the door from either side. Chenault told the minor's mother he had some other things to do and would not be talking to the minor right away; she was welcome to wait at the station or to return to work where Chenault would call her later. She left.

Chenault went back to a staff meeting, and when it ended about 11:20 a.m. he checked on the minor, asking if he wanted to use the restroom or wanted something to drink. The minor declined. Chenault checked again at 12:30.

The minor said he was okay. Chenault was waiting for his partner, Sergeant Mercado, to arrive so that they could interview the minor together. About 1 p.m. Chenault brought the minor a bag lunch. When he was finished eating, about 1:25 p.m., Chenault and Mercado interviewed him.

Chenault read the minor his *Miranda* rights from a police department form. The minor answered "yeah" when asked if he understood each right and when asked if he wanted to continue the interview. He also signed the form at the point his responses were entered. The initial interview lasted about an hour, and was not tape-recorded. After that the officers got a tape recorder, reviewed (on tape) the waiver of rights, and conducted a taped interview, which ended at 2:46 p.m. Chenault called the minor's mother, and also called the district attorney's office to arrange for that office to conduct another interview. The minor was interviewed by a team from the district attorney's office sometime after 5 p.m. The minor's mother arrived around 5 p.m. and Chenault told her what the minor had said. She did not ask to see him before he was interviewed again. After the interview with the district attorney team, the minor was told he was under arrest, and given a few minutes to talk with his mother.

Chenault testified that the minor never asked to speak with his mother or any other relative. His mother never asked to be present at his interview. Chenault also denied making any threats or promises to obtain the confession. On cross-examination, Chenault was asked if the minor ever asked "where his mother was." Chenault answered that "[the minor] never asked about his mother." Chenault conceded on cross-examination that he considered the minor under arrest from the time he was put in the interview room and that the minor was not told he was under arrest until completion of the district attorney's interview.

The minor testified only for purposes of the motion to exclude his confession. On the morning of January 22 he saw his probation officer. She told him that if he got in any trouble he would be sent to camp; this made him feel that he had better tell the police what they wanted to know, or he would go to camp. He and his mother went straight from the probation officer to the police station. As soon as Chenault took him to the interview room he patsearched him, which made the minor feel that he had done something wrong. Chenault took the contents of the minor's pockets; the minor thought he was being arrested and felt nervous and afraid.

The minor was left alone and lost track of time. When Chenault came back the minor asked where his mother was; Chenault said she had gone back to work, which made the minor upset and afraid. Left alone again, he

tried to sleep. Chenault eventually returned and the minor asked whether his mother was coming back for him; Chenault said he did not know. The minor felt shaky and started crying. He then fell asleep. Chenault brought him lunch, but the minor did not eat the sandwich because he does not eat salami. Chenault returned with another officer.

According to the minor, the officers did not inform him of his rights before beginning the questioning. After he said where he had been on the day of the crimes and afterward, Chenault told him to "cut the bullshit." Chenault told him that he and his cousin had been identified as participants in a shooting; this made the minor scared but also angry. Chenault said if the minor did not cooperate he could be held until he was 25 years old, but if he cooperated Chenault could help him. The minor decided to just do whatever Chenault wanted. He thought he would be released if he did so. The officers read him his *Miranda* rights and he signed the waiver form. Chenault pulled out a paper with a story of the crime already written out, and the officers rehearsed with the minor a question-and-answer session in which the minor took the answers from what was written on the paper. During the tape-recorded interview the minor kept the prewritten story in front of him so that he would not forget any of it.

The minor stated he had been given *Miranda* warnings on two or three previous occasions but did not understand that he did not have to talk to the police. On one previous occasion he told an officer he did not want to talk, and was beaten.

The minor's mother testified that she telephoned Chenault on the morning of Monday, January 22, told him that she was taking the minor to see his probation officer at 10 a.m. and would bring him in after that. Chenault said that was okay. After taking the minor to another room, Chenault returned and briefly questioned the mother about some other relatives, then said that it would take awhile for him to interview the minor and he would call her when he was done. The minor's mother waited for several minutes, then called her mother who advised her to go back to work, which she did.

Chenault denied making the promises and threats described by the minor, and denied that he had the minor read from a script.

The court ruled the taped confessions to the police and the district attorney's team voluntary and admissible. The court found Sergeant Chenault's testimony more credible than the minor's; that the minor had been properly advised of his *Miranda* rights; and that the minor had not asked to see his mother during the interview period.

I

 "The admissibility of a confession depends upon the totality of the circumstances existing at the time the confession was obtained. [Citations.] A minor can effectively waive his constitutional rights (*People* v. *Lara* (1967) 67 Cal.2d 365, 390-391 . . .) [footnote omitted] but age, intelligence, education and ability to comprehend the meaning and effect of his confession are factors in that totality of circumstances to be weighed along with other circumstances in determining whether the confession was a product of free will and an intelligent waiver of the minor's Fifth Amendment rights (*id.*, at pp. 385-387)." (*People* v. *Maestas* (1987) 194 Cal.App.3d 1499, 1508 [240 Cal.Rptr. 360].)

 Under federal and California constitutional law, the prosecution must show voluntariness of a confession by a preponderance of the evidence. (*Lego* v. *Twomey* (1972) 404 U.S. 477, 489 [30 L.Ed.2d 618, 627, 92 S.Ct. 619]; *People* v. *Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042].) The minor argues that the preponderance standard applies only to adults and that where juveniles are concerned, federal constitutional law mandates proof of voluntariness beyond a reasonable doubt. He cites the Supreme Court's statement that where a minor was not assisted by counsel at the interrogation "the greatest care must be taken to assure that the admission was voluntary." (*In re Gault* (1967) 387 U.S. 1, 55 [18 L.Ed.2d 527, 561, 87 S.Ct. 1428]; see also *Gallegos* v. *Colorado* (1962) 370 U.S. 49, 54 [8 L.Ed.2d 325, 328-329, 82 S.Ct. 1209] [confession was involuntary where 14-year-old was held incommunicado for 5 days]; *Haley* v. *Ohio* (1948) 332 U.S. 596, 599-600 [92 L.Ed. 224, 228-229, 68 S.Ct. 302] [confession involuntary where 15-year-old was interrogated by relays of officers from midnight until 5 a.m.].) While these opinions stress the importance of a suspect's age in determining voluntariness, they do not stand for the principle that a different standard of proof applies to juveniles than to adults. "[The] totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so." (*Fare* v. *Michael C.* (1979) 442 U.S. 707, 725 [61 L.Ed.2d 197, 212-213, 99 S.Ct. 2560].) The age of a minor may color all or most aspects of a court's analysis of voluntariness. Threats, promises, confinement, lack of food or sleep, are all likely to have a more coercive effect on a child than on an adult. But the fundamental analytical steps are the same in both cases. The trial court must first determine the evidentiary facts—what happened—and then, weighing all of the circumstances, determine the ultimate question, whether the individual's free will

was overborne. Under the minor's proposal for a differential standard of proof, the trial court would be evaluating the same questions of evidentiary fact—for example, whether a promise of leniency was made—differently depending on the age of the accused. Neither precedent nor reason supports such a distinction. The minor has not demonstrated that federal law requires a different standard of proof for juveniles.

## II

In reviewing a finding of voluntariness we make an independent examination of the record and determine the ultimate issue independently as well. With respect to conflicting testimony, however, we accept the version favorable to the People to the extent it is supported by the record. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672]; *People* v. *Brown* (1981) 119 Cal.App.3d 116, 129 [173 Cal.Rptr. 877].) The juvenile court expressly credited Sergeant Chenault's version of events over the minor's where the versions conflicted, and we defer to that credibility judgment. In particular, we take it as established that the minor was admonished of his rights *before* questioning began, that no prepared script was used to prompt the minor, and that no threats or promises were made to induce the confession. Nor does the tape recording of the police interview support the minor's testimony; it is apparent from listening to that tape that the minor was calm, that he spoke in his own words and that he did not read from a prepared script.

Although a juvenile's request to speak with his parent will normally be construed as an invocation of his Fifth Amendment rights (*People* v. *Burton* (1971) 6 Cal.3d 375, 382-383 [99 Cal.Rptr. 1, 491 P.2d 793]), police interviewers are not obliged to advise a juvenile suspect of a right to speak with parents or have them present during questioning (*In re John S.* (1988) 199 Cal.App.3d 441, 445-446 [245 Cal.Rptr. 17]; *People* v. *Maestas, supra*, 194 Cal.App.3d at pp. 1508-1509). The minor argues there was such a duty here because Chenault had arranged the time and place of the interview, had separated the minor from his mother, and then delayed the interrogation, inducing the mother to return to work. The record does not support this charge of intentional and unfair manipulation. It was *the minor's mother* who set the time of their arrival at the police station, telling Chenault she would bring the minor there after his probation department appointment. Chenault was in a staff meeting when they arrived, and then waited for his partner to be present before interviewing the minor. There was no evidence that the delay was intentional or that it was designed to separate the minor from his mother.

There is some suggestion in the record that Chenault waited until the minor had been released from his unrelated custody in order to avoid having

to interview him with an attorney present. Although Chenault did not testify as to the district attorney's reasons for telling him to wait, it is a reasonable inference that the purpose was to avoid any constitutional obstacle to interviewing the minor without his attorney present while other charges were pending. We do not believe this inference renders the confession involuntary. It had no effect on the minor's judgment and free will, since as far as the record shows he was unaware that Chenault had deliberately waited until he was out of custody. The minor was, in addition, fully advised of his right to consult with an attorney and freely waived that right.

The minor was held alone in a small locked interview room for more than two hours before being interviewed. Again, there is no evidence this delay was intentional. Nor did this period of detention constitute coercion sufficient to overcome the minor's free will. Chenault checked on the minor periodically. During this period the minor also ate lunch and tried to take a nap. It is not plausible that the tension created by this detention so overcame the minor's judgment that he would falsely implicate himself in a murder.

The minor's youth demands that we scrutinize the entire record carefully for evidence of coercion. We have done so, and with the exception of the minor's testimony of promises, threats, and prewarning questioning, testimony which was reasonably rejected by the juvenile court as less credible than the contrary testimony from Sergeant Chenault, we find none. The minor, while young, was experienced in the ways of the juvenile justice system. He was interviewed for only an hour before making his taped confession. From the tape as well as from Chenault's testimony it appears that he remained calm and in control of himself throughout the interview process. He was fully and timely warned of his constitutional rights, unambiguously waived them, and did not assert them at any later time.

The order of the juvenile court is affirmed.

King, J., and Haning, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 26, 1992.