Filed 11/5/14  P. v. Gil CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STEVEN ANTHONY GIL et al.,<br><br>    Defendants and Appellants. | B245307<br><br>(Los Angeles County<br>Super. Ct. No. VA123343) |

APPEAL from judgments of the Superior Court of Los Angeles County, John A. Torribio, Judge.  Affirmed.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant Steven Anthony Gil.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant Steven Ochoa Zamora.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen and Toni R. Johns Estaville, Deputy Attorneys General, for Plaintiff and Respondent.

———————

Appellants Steven Anthony Gil and Steven Ochoa Zamora appeal from the judgments entered following their convictions by separate juries of first degree murder (Pen. Code, § 187) with, as to Gil, a principal armed with a firearm (Pen. Code, § 12022, subd. (a)(1)) and, as to Zamora, personal use of a firearm, personal and intentional discharge of a firearm, and personal and intentional discharge of a firearm causing great bodily injury and death (Pen. Code, § 12022.53, subds. (b), (c), & (d)). The court sentenced Gil and Zamora to prison for 26 years to life, and 50 years to life, respectively. We affirm.

### FACTUAL SUMMARY

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established on January 5, 2012, Freddy Sosa (aka Thief) texted Gil that Gerardo Fernandez (the decedent, aka Cuba) and Allan Felix (aka Terco) wrote "Fuk Thief," and crossed out the name Thief in graffiti. Gil asked Sosa to photograph the changes and show them to Gil the next day. Gil later asked Sosa for the number of "Sinners." Gil texted Sinners, "This is Sikone Sinner wen me an Freddy *smash* on Cuba Terco U and smokes need nt to gt mad those fools aint gonna cross my lil homie out an disrespect my hood" (*sic;* italics added) (hereafter, the Smash statement). Downey Police Detective Rolando Renteria testified "smash" meant to create some sort of injury.

Sosa sent a phone number to Gil. Gil later texted Zamora, asking what he was doing Saturday. Zamora asked Gil what was going on, and Gil replied, "Drama fool . . . I crossed out that fool Cuba cuz he try to tell my lil homie Thief to gt n his hood . . . I gt two bitches for Saturday wat u wanna kik it." Zamora replied, "Man homie fuk that foo lets *light that foo* up that foo ain't nobody . . . . Was up I'm down [for] wit the bitches haha . . . ." (*sic;* italics added) (hereafter, the Light statement; bracketed material in the original). Renteria testified, "light someone up" meant to shoot someone.

Natalie Gonzalez testified on January 7, 2012, she was with appellants and Emily Cabral. Everyone was drinking that night at Zamora's house. Appellants shared a 24-pack of beer.[1] The group left to look for Sosa but did not find him. Gil drove the group to a restaurant parking lot in Downey, then spoke to someone on the phone. Fernandez and Felix were in the parking lot.

Appellants eventually exited the car while Gonzalez and Cabral remained inside. Gil, Felix, and Fernandez conversed. Fernandez and Felix walked towards Fernandez's nearby apartment complex. Zamora or Gil followed. As Fernandez and Felix ascended stairs, Felix heard someone say, "Hey, come here." Fernandez went downstairs. Felix lost sight of Fernandez, then heard gunshots. Fernandez had been fatally shot. Felix saw the shooters run back to their car.

Gonzalez and Cabral heard gunshots after appellants exited the car. Appellants ran back to the car, entered, and left quickly. Gonzalez asked what happened but appellants did not answer. Gil turned up the radio. The People introduced into evidence before Gil's jury that on January 8, 2012, Gil texted someone, "I set him up" and, later that day, "Yea, fkn I had set him up my other homie shot five times at both of them."

Renteria interviewed appellants separately. (Each appellant's statement was admitted into evidence before his jury only.) On January 21, 2012, Renteria interviewed Zamora. After Zamora waived his *Miranda*[2] rights, Renteria told Zamora that Renteria was investigating a murder. Renteria asked Zamora what Zamora was doing on January 7, 2012. Zamora indicated he was in school from 5:30 p.m. to 9:30 p.m., then went home and remained there. Renteria asked Zamora where the gun was. Zamora denied knowing anything about a gun. Zamora later testified about 10:30 p.m., "Steven" and a girl came to Zamora's house. They socialized and, no later than 11:20 p.m., Steven and the girl left.

---

[1] Cabral expressly testified appellants, Cabral, and Gonzalez were drinking at Zamora's house, but never expressly testified Gil drank rum or smoked weed.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

Renteria indicated he was investigating murder, a serious crime. He showed Zamora his photograph and asked why witnesses in the Downey restaurant identified Zamora by the photograph. Zamora denied knowing why, denied being on that side of town, and claimed he had been drunk that day.

Renteria said he was giving Zamora a way out and really wanted to help him but, if Zamora continued to lie, Renteria could not help him. Renteria indicated Zamora was trying to do good for himself, this was outstanding, and Zamora was on the right track. Zamora agreed. Renteria indicated he thought Zamora was at the wrong place at the wrong time. Zamora indicated he "could have been over there."

Renteria said he was throwing Zamora a lifeline, once the train started, Zamora could either play ball or the train was going to run him over, Renteria would hate to see the look on Zamora's parents' faces, and Renteria would hate for Zamora to get creamed by the train. Zamora admitted he was "in the car." Zamora acknowledged he was 18 years old and a grown man.

Zamora told Renteria the following. Zamora and Steven (i.e., Steven Gil) arrived in the parking lot. Zamora's friend Thief was already there. Steven and the victim conversed. Thief told Steven and Zamora that Thief and the victim had argued. Thief started everything. Steven, then Zamora, went towards the victim, and Thief shot the victim. Zamora and Steven ran back to the car.

Renteria told Zamora that Zamora was trying to get something off his chest but was not being completely truthful. Renteria indicated he did not think Zamora was a hardcore gangster and Renteria believed Zamora was trying to turn his life around. Zamora told Renteria that Zamora thought Steven probably was going to buy dope from the victim, but Zamora was not sure. Zamora later told Renteria that Steven told Zamora that Steven was going to buy dope from the victim.

Zamora later said that, on that day, he got out of school after 12:30 p.m., it was his cousin's birthday, and Zamora spent the day with his family. Zamora also suggested he was confused about the dates. Zamora denied Steven was the shooter.

4

Zamora later said he had a nine-month old son, Zamora was going to school, and he did not want his son to see what Zamora was doing. Renteria indicated Zamora was a good man. Renteria said he believed Zamora wanted to put this behind, Zamora indicated yes, and Renteria said he wanted to give Zamora an opportunity to tell the truth. Renteria later indicated a Detective Klevos would ask questions, but Renteria asked why Zamora initially had lied. Zamora indicated he had been afraid and had not wanted to lose his son.

Klevos told Zamora that Klevos could see Zamora was hurting. Zamora agreed. Klevos said he was different from Renteria and was blunt. Klevos said he expected respect. Zamora indicated he understood. Klevos asked if Zamora had a son, and Zamora replied yes. Klevos said Zamora had parents and was going to school. Klevos asked if Zamora was 19 years old and Zamora said he was 18 years old. Klevos indicated murder was serious and told Zamora not to cover up anything.

Klevos indicated he had watched the video numerous times and Thief was not present at the scene. Zamora asked whether the detectives would "get [Thief]" if Zamora pointed him out. Klevos repeated this was Zamora's chance, it was Zamora's life, and Zamora needed to be honest.

Klevos asked Zamora what happened. Zamora asked what was the least amount of time he would get "if we make a deal and shit." Klevos indicated he was investigating, and the rest would be up to the district attorney and courts. Zamora denied that that was a guarantee he would not do time. Klevos indicated that was not up to the detectives.

Zamora said he wanted to work out a deal. Renteria said if Zamora was willing to play with the detectives, Renteria would put in the report exactly what Zamora said. The detectives would then go the district attorney and tell the district attorney that Zamora had been truthful and if it had not been for Zamora, the detectives would not have had anything. Renteria said he did not mind going to bat for Zamora with the district attorney. Zamora said he wanted to see his son, he did not want to do life, and he wanted to work out a deal with the detectives right then.

5

Renteria indicated as follows:  Klevos had said Thief had not been present at the scene.  Renteria wanted to see how honest Zamora would be.  When the judge and district attorney read the report, read the detectives told Zamora they had the video, and Zamora still "went with the whole Thief story," the judge and district attorney would decide not to help Zamora.

Renteria said he was not making any promises to Zamora.  Renteria guaranteed he would sit with the district attorney, but Renteria would not say Zamora was going to be released the next day.  Zamora said he did not want to do life.  Renteria asked Zamora whether, if Zamora read a report, Zamora would want to work out a deal with someone who was not truthful or would he want to work out a deal with someone who wanted to play, was at the wrong place at the wrong time, and had a nine-month-old child.  Zamora asked what was the guarantee he would not do life.

Renteria said the detectives would talk with the district attorney, the detectives had a video of the incident, and it was up to Zamora whether he wanted to help the detectives or "get run over with this train."  Zamora repeatedly indicated he wanted to see his son and did not want to do life.  The following occurred:  "Did you pull the trigger?  It wasn't you, right?  So don't worry about the whole doing life thing.  Right now the only thing . . . that should be going through your mind, is how to help us close this case, so that we can help you be with your son."  Renteria began to say what would happen if the matter went to trial, but Zamora replied there would be no trial.  Zamora indicated he understood the detectives were trying to help him.

Renteria said he did not want to make a promise to Zamora.  Zamora indicated he understood.  Renteria said he did not want to make a promise to Zamora, then go to the district attorney who would say Zamora was not truthful from the beginning.  Zamora asked what would the detectives tell the district attorney if Zamora talked with them.  Renteria said he would write exactly what Zamora told the detectives.  Zamora asked what his maximum time would be.

Renteria said the pain was killing Zamora because Renteria knew Zamora was a good person. Zamora replied yes but mentioned his son. Renteria said "do it for him." Zamora indicated he would, but said his son would not see Zamora for years. Renteria said if Zamora did not start playing ball with the detectives, Renteria guaranteed Zamora would not see his son. Zamora indicated he was playing ball.

Renteria said the detectives were going to give Zamora an opening, a window, an opportunity for Zamora to see his son, and light at the end of the tunnel, but Renteria guaranteed if Zamora did not "tell [the detectives]," they would close the tunnel.

Renteria indicated he believed as follows. Steven (i.e., Gil) called the victim and asked him to meet Steven in the parking lot, and Steven went there to buy methamphetamine. Steven and Zamora went to the parking lot and saw the victim. Zamora may not have been paying attention. The victim walked away, ascended stairs, returned, and met Steven and Zamora in front of a trash can. Steven took out a gun and shot the victim. Zamora replied, "Nah, it wasn't Steve." Renteria asked if it was Zamora, and Zamora replied, "Yeah, it was me, sir. It was like you said, it was the wrong place, wrong time. It was just all a mistake."

Zamora later said, "Maybe I was just drunk and did the stupidest shit in my life ever." Zamora claimed he was drunk at the time of the shooting,[3] he did not aim the gun, and he intended to scare, not kill, the victim. There had been no ill-will between Zamora and the victim.

---

**3** Evidence of any intoxication of Zamora is not pertinent to this appeal. Suffice it to say the trial court gave to Zamora's jury an instruction on voluntary intoxication as it related to intent to kill, premeditation, and deliberation.

On January 25, 2012, Renteria interviewed Gil. Gil initially denied knowledge of the January 7, 2012 incident. However, Gil later said the following. Fernandez crossed out South Gate Trece, Gil became angry, and Gil went to the parking lot. Appellants went to the parking lot with two girls. Gil asked Fernandez for $20 worth of methamphetamine, and Fernandez walked away and went behind a dumpster. Appellants followed and shot Fernandez. There was only one gun. Gil did not pull the trigger. The detective asked Gil why Gil thought Fernandez had been shot, and Gil replied, "I don't know. Everybody dies."

Appellants presented no defense evidence.

## ISSUES

Gil claims the trial court (1) erroneously permitted Renteria to present expert testimony interpreting slang and (2) erroneously denied Gil's request for an instruction on voluntary intoxication. Zamora claims he was denied effective assistance of counsel and due process by his trial counsel's failure to seek exclusion of Zamora's confession on the ground it was involuntary.

## DISCUSSION

1. *Renteria Properly Testified at Gil's Trial Concerning Slang*.

    a. *Pertinent Facts.*

On October 5, 2012, during the People's case-in-chief but outside the presence of the jury, the trial court at Gil's request conducted an admissibility hearing concerning Renteria's ability to interpret the word "smash" in the Smash statement and the phrase "light that foo" in the Light statement. Gil indicated Renteria proposed to testify at trial "smash" meant cause bodily harm and "light that foo" meant shooting somebody.

At the hearing, Renteria testified during direct examination by the People that he had been a sworn peace officer for about 12 years and, during that time, he had dealt with people who used slang. The court indicated the issue was gang slang and the prosecutor agreed.

8

Renteria then testified as follows. After Renteria graduated from the Los Angeles County Sheriff's Department, he worked in custody facilities for four years, i.e., Northern County Correctional Facility (NCCF), "CRDF," Twin Towers Correctional Facility, and Men's Central Jail. During this time, Renteria supervised thousands of inmates. While at NCCF, Renteria was in charge of the gang modules. While at "CNDF," he was in charge of the Crips modules. While at Men's Central Jail, Renteria worked in the discipline module and gang module. During this time, Renteria had various opportunities to supervise, work directly with, interview, and talk to, gang members, and he investigated gang crimes inside of the jails. During this period, Renteria got to know gang members' lifestyles.

While working with Downey Police Department, Renteria not only had been assigned to regular patrol, but had been assigned to the gang unit for about two years. In the gang unit, Renteria investigated and dealt with gang members daily. Renteria investigated any crimes committed by a gang member.

Renteria had spoken to thousands of gang members. He had attended at least 200 hours of gang classes and conferences dealing with the Mexican Mafia, "Southern gangs," female gangs, and motorcycle gangs. Renteria was a member of the Latino Investigator Gang Association in California.

During Renteria's encounters with gang members, they used slang daily. Renteria heard the term "smash" several times. Renteria understood it to mean "to create some sort of bodily injury to someone else." Renteria had heard the phrase "to light someone up" several times during his career. Renteria understood the phrase to mean "to shoot someone."

During cross-examination, Renteria testified as follows. Renteria had heard the term "smash" during conversations or interviews probably at least 50 times during his 12-year career. When an interviewee said, "we went to smash on him," Renteria asked what the interviewee meant by "smash," and that was how Renteria obtained information about the term. Renteria asked this during each interview whenever the term was used. Renteria was unaware of any other meanings for the word "smash."

9

Renteria heard the phrase "light that foo up," over 30 times during his career. Every time gang members said "light you up," Renteria would ask what that meant, and they would say, "I was going to shoot somebody." In Renteria's experience, gang vernacular changed according to the racial composition of the gang, but the words gangs used 10 years ago meant the same thing today.

After Renteria testified, the court found him to be "qualified." Renteria testified at trial concerning the meaning of "smash" and "light somebody up" as indicated in the Factual Summary.

b. *Analysis.*

Gil claims the trial court erroneously received Renteria's expert testimony interpreting street slang.[4] He argues Renteria lacked the qualifications of an expert to interpret the terms "smash" and "light somebody up." We reject Gil's claim.

In a similar situation, our Supreme Court stated in *People v. Champion* (1995) 9 Cal.4th 879, 924 (*Champion*), "Defendants assert that the trial court erred in permitting the prosecution to recall [a Los Angeles County Sheriff's deputy] to explain the meaning of a number of the words used by defendants in their tape-recorded conversation in the van transporting them to the jail. [Fn. omitted.] They contend that this testimony was beyond the scope of [the deputy's] expertise. We do not agree. Because [the deputy] had *spent a number of years investigating and associating with juvenile gangs, the trial court could reasonably conclude he was sufficiently familiar with gang terminology to accurately interpret the words used by defendants*. The use of an expert for this purpose

---

[4]     "Evidence Code section 720 provides that a person may testify as an expert 'if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates,' and that '[a] witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony.' The trial court's determination that a witness qualifies as an expert is a matter of discretion that will not be disturbed absent a showing of manifest abuse. [Citation.] We will find error regarding a witness's credentials as an expert only if ' " 'the evidence shows that a witness *clearly lacks* qualification as an expert . . . .' " (Italics in original, [citations].)' [Citation.]" (*People v. Jones* (2012) 54 Cal.4th 1, 57.) Zamora joins in all of Gil's contentions.

10

is not uncommon. [Citations.] Here, the trial court could reasonably conclude that the meaning of some of the words used by defendants were 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . .' (Evid. Code, § 801, subd. (a).)" (*Champion*, at pp. 924-925, italics added.)

Similarly, given the facts here, the trial court reasonably could conclude Renteria was sufficiently familiar with gang terminology to accurately interpret the term "smash" and the phrase "light somebody up." The trial court did not abuse its discretion by concluding Renteria was qualified as an expert to interpret the meaning of the above quoted terms. (Cf. *Champion, supra*, 9 Cal.4th at pp. 924-925; *People v. Roberts* (2010) 184 Cal.App.4th 1149, 1194.) Moreover, application of the ordinary rules of evidence, as here, did not violate Gil's Fifth, Sixth, or Fourteenth Amendment rights. (Cf. *People v. Boyette* (2002) 29 Cal.4th 381, 427-428.)[5]

---

[5] Gil's citation to *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*) is inapposite. According to *Killebrew*, the appellate court in that case reversed a judgment where (1) the sole evidence of the elements of a crime was the testimony of a police gang expert, (2) the expert erroneously testified as to the ultimate issues of the defendant's subjective knowledge and intent, and (3) the trial court admitted that testimony under the mistaken notion all officers' opinions on gangs were admissible. (*Id.,* at pp. 649-659.) None of those factors exist in the present case. In any event, the content of Renteria's expert testimony pertained to the interpretation of terms, not to Gil's knowledge or intent, and Renteria never testified about how he believed the present case should have been decided. Finally, Gil complains Renteria did not, during his interview with each appellant, confirm the meaning of the slang terms at issue as Renteria testified he consistently had done with past gang members. However, first, Gil has failed to demonstrate with exact page citations to the record (*Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1379) that either appellant, during his interview, recited the text message, and slang, at issue. Second, Zamora's statement during his interview was not admitted into evidence at Gil's trial. Finally, Gil has not demonstrated he raised this issue to the trial court before it ruled on the admissibility of Renteria's testimony and it was received. (See *People v. Greenberger* (1997) 58 Cal.App.4th 298, 336.) Gil has failed to demonstrate prejudicial error in connection with his complaint.

11

Even if the trial court erred by not excluding Renteria's interpretive testimony at trial that "smash" meant to create some sort of injury and "light somebody up" meant to shoot someone, there was overwhelming evidence Gil meant to injure and shoot Fernandez, even absent Renteria's interpretive testimony; therefore, any such error was not prejudicial under any conceivable standard. (Cf. *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*).)

2. *The Court Did Not Err by Refusing to Instruct on Voluntary Intoxication as to Gil.*

Gil requested the trial court to instruct on his alleged voluntary intoxication as it related to the issues of intent to kill, premeditation, and deliberation. The trial court refused to do so. Gil claims the refusal was error. We reject the claim. The sole evidence Gil drank anything at or before the time of the shooting was the evidence that, on the night of January 7, 2012, and prior to the shooting, Gil was drinking at Zamora's house, and appellants drank a 24-pack of beer. This was not substantial evidence Gil was intoxicated at the time of the shooting. Even if it was, it was not substantial evidence Gil was intoxicated to the point he failed to formulate intent to kill, premeditation, or deliberation. (Cf. *People v. Marshall* (1996) 13 Cal.4th 799, 848; *People v. Ivans* (1992) 2 Cal.App.4th 1654, 1661-1662.)

Finally, even if evidence Gil was drinking at Zamora's house, and appellants drank a 24-pack of beer, constituted substantial evidence Gil was intoxicated to the point Gil failed to formulate intent to kill, premeditation, or deliberation, the rest of the evidence in this case provided overwhelming evidence Gil harbored intent to kill, premeditation, and deliberation. The People prosecuted Gil for murder with the degree of the murder being first degree based solely on the theory the murder was willful, deliberate, and premeditated. The jury found Gil guilty of first degree murder. Any error by the trial court in refusing to instruct on voluntary intoxication as to Gil was not prejudicial under any conceivable standard. (Cf. *People v. Pearson* (2012) 53 Cal.4th 306, 325, fn. 9, 326; *Watson, supra,* 46 Cal.2d at p. 836; *Chapman, supra,* 386 U.S. at p. 24.)

12

3. *No Ineffective Assistance of Counsel Occurred.*

Zamora claims he was denied effective assistance of counsel and due process by his trial counsel's failure to seek exclusion of Zamora's statement to Renteria on the ground it was involuntary.[6] We reject the claim. The record sheds no light on why Zamora's trial counsel failed to act in the manner challenged, the record does not reflect said counsel was asked for an explanation and failed to provide one, and we cannot say there simply could have been no satisfactory explanation. (Cf. *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268.) For this reason alone, Zamora's ineffective assistance claim fails.

Moreover, we can conceive of a reason why Zamora's trial counsel reasonably might have refrained from seeking to exclude Zamora's statement on the ground it was involuntary. "Absent improper threats or promises, law enforcement officers are permitted to urge that it would be better to tell the truth. (*People v. Carrington* (2009) 47 Cal.4th 145, 171; *People v. Hill* (1967) 66 Cal.2d 536, 549 ['When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper . . . .']; . . . see also *Amaya-Ruiz v. Stewart* (9th Cir. 1997) 121 F.3d 486, 494 [finding no coercion in statements that ' "the … [c]ourt system will not forgive your lies," ' and an exhortation to the suspect to tell the truth if he wants to receive ' "forgiveness" '].)" (*People v. Williams* (2010) 49 Cal.4th 405, 444.)

---

[6]    A statement is involuntary only if it is the product of police coercion. (*People v. Mickey* (1991) 54 Cal.3d 612, 647.) A statement is involuntary when, among other circumstances, it was extracted by any sort of threats or obtained by any direct or implied promises, however slight. Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the totality of the circumstances. (*People v. Jablonski* (2006) 37 Cal.4th 774, 813-814.) "Under federal and California constitutional law, the prosecution must show voluntariness of a confession by a preponderance of the evidence." (*In re Aven S.* (1991) 1 Cal.App.4th 69, 75.)

There is no dispute the 116-page transcript of Zamora's interview, which said transcript was admitted into evidence, accurately reflects the taped interview, and the tape was also admitted into evidence. After Zamora, who indicated he was 18 years old, waived his *Miranda* rights,[7] he gave conflicting accounts of what happened, but he ultimately admitted shooting Fernandez. The facts detectives (1) promised to talk with the district attorney and present Zamora's account of what happened, (2) explained the truth would have a better impact upon the district attorney and court than falsehoods, and (3) told him the detectives could not guarantee what the district attorney and court would do, did not constitute coercion.

Zamora's trial counsel reasonably might have refrained from seeking to exclude Zamora's statement on the ground it was involuntary because Zamora's trial counsel concluded he would not be able to prove to a preponderance of the evidence Zamora's statement was coerced. No ineffective assistance of counsel, or denial of Zamora's right to due process, occurred.

---

[7] An express *Miranda* waiver was not required. (*People v. Whitson* (1998) 17 Cal.4th 229, 250.) Zamora was advised of his *Miranda* rights, indicated he understood them, and proceeded to talk with Renteria. This was an implied waiver. (Cf. *People v. Sully* (1991) 53 Cal.3d 1195, 1233.)

## *DISPOSITION*

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, J.

We concur:


KLEIN, P. J.


ALDRICH, J.