Filed 4/30/14  In re C.C. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re C.C., a Person Coming Under the Juvenile Court Law. | B247219 (Los Angeles County Super. Ct. No. YJ36638) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>C.C.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Wayne C. Denton, Juvenile Court Referee.  Affirmed in part and reversed in part with directions.

Mary Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Mary Sanchez, Deputy Attorney General, for Plaintiff and Respondent.

————————————

C.C. appeals from his adjudication as a ward of the court under Welfare and Institutions Code section 602.[1]  Appellant argues that the juvenile court erred in denying his motion seeking discovery of complaints related to dishonesty against a deputy sheriff, and erred in concluding that his April 26, 2012 written and oral confessions were admissible.  Appellant also argues that conditions of probation included in the juvenile court's February 21, 2013 minute order, which were not part of the court's oral pronouncement, must be stricken from the order.

We hold that appellant was entitled to an in camera inspection of responsive documents, if any exist, and the juvenile court erred by summarily denying his *Pitchess*[2] motion without the required in camera inspection.  We reverse and remand to permit the juvenile court to conduct an inspection.  If the court's inspection reveals no relevant information, the court must reinstate the order of wardship.  If relevant information is revealed, the order will be reversed only if appellant demonstrates a reasonable probability of a different result had the information been disclosed.  We also hold that appellant's confession was voluntary and admissible.  Finally, we hold that conditions of probation contained in the juvenile court's minute order cannot be reconciled with the court's oral pronouncement and remand to the trial court for clarification.

## PROCEDURAL BACKGROUND

A petition, filed in the juvenile division alleged that appellant C.C., came within the provisions of under section 602 based on an allegation that the 13 year old committed the crime of unlawful driving or taking of a vehicle (Veh. Code, § 10851, subd. (a).)  Appellant denied the allegation.  In proceedings before the juvenile court, appellant filed a *Pitchess*

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

motion. He also filed a motion arguing that he had not knowingly and voluntarily waived his *Miranda*[3] rights. The juvenile court denied both motions.

Following an adjudication, the court sustained the petition. The juvenile court declared appellant a ward of the court pursuant to section 602 and ordered him placed on probation at home for a period of six months, subject to various conditions.

## FACTUAL BACKGROUND

*Prosecution evidence*

In April 2012, Zarmena Peracha was a teacher at Rogers Middle School. Appellant, a seventh grade student who had transferred to the school a few weeks earlier, was one of 30 students in Peracha's seventh period class. The class met right after lunch and adjourned about 2:20 p.m. Appellant sat next to Peracha's desk. David H. was also a student in the same class.

On Friday, April 20, 2012, when Peracha was leaving for home, she was unable to find her keys. She had gone out for lunch that day and placed them on her desk when she returned. Peracha believed she had misplaced her keys, and called her husband who brought her spare car key so she could drive home.

The next Wednesday, April 25, 2012, when Peracha went to the teacher's parking lot at about 3:15 p.m., she discovered that her car, a 2003 red Honda Odyssey, was missing. Peracha notified the school's main office, and called the Los Angeles Sheriff's Department (LASD) to report the missing car. Later that day, Peracha reviewed the school's surveillance video, in which she saw a tall "guy, African American," get into her car, back it up and drive the car out of the lot at 3:03 p.m. or 3:04 p.m. Peracha was unable to identify the person.

The school's security officer, Shelley Yandell, reviewed the surveillance video the following day.[4] The school's surveillance system has 34 cameras, including cameras which record the staff parking lot. Yandell observed five shots from three cameras. In one shot, Yandell saw someone just before he entered Peracha's car on the driver's side. She could not

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

[4] No portion of any video was presented as evidence.

see the person's face when he was at the vehicle—only the top of his head. She then observed the car "being pulled out of the parking spot." Yandell then "backtracked" to try to find video images of the person who had taken the car. The person driving the car out of the lot could not be seen in the video of the exiting car.

Yandell identified appellant as the perpetrator based on his clothing—red shoes, white pants, red shirt and a Gucci backpack. Appellant was the only student on campus with a Gucci backpack. The school has about 1,100 students. Yandell was able to see appellant's face in "camera shots" before he made his way to the car on the driver's side. By zooming in on the image of the person about to enter the car, Yandell could see the person's hair and down to the middle of his eye. He had not worn a hoodie. The person had a thin frame and "tight little curls," like appellant. Yandell disagreed that tight little curls was a typical hairstyle for a black male, but acknowledged that "quite a few" black male students on campus shared that hairstyle, and three or four of whom are also thin-framed. Yandell observed appellant standing at the corner of a fence and then observed him approach the vehicle. She never lost sight of him, and "could always see a part of him." Yandell denied that she had experienced problems with appellant since his arrival at the school, denied that she disapproved of his manner of dress and denied telling appellant's mother she thought her son was a gang member.

Uniformed LASD Deputy Troy Hilliard arrived at the school in response to the report about Peracha's missing car. Deputy Hilliard was told the perpetrator had been identified through video surveillance. He reviewed video footage with Yandell. He saw a male black student wearing a red hoodie enter the staff parking lot and hide behind a red Honda Odyssey. Deputy Hilliard could not see the person's face. Deputy Hilliard observed the car go in reverse, pull out of the lot, and turn left onto the street. Yandell told Deputy Hilliard the identity of the student whom she believed was depicted in the video.

Deputy Hilliard took appellant out of class and to the school principal's office, where they met for a "few moments," at most 15 minutes. The principal and possibly one other person was present. Deputy Hilliard interviewed appellant after giving appellant his *Miranda*

4

rights and taking him through a *Gladys R.*[5] questionnaire. Deputy Hilliard testified that appellant agreed to waive his rights and to speak to him. Deputy Hilliard explained to appellant that the school had 34 cameras, and told him they knew appellant was responsible for taking Peracha's car. At first, appellant denied having done so. However, after a "few moments" during which Deputy Hilliard "continuously press[ed] the issue of the cameras" on which he had been seen, appellant admitted to "having the car and parking it down the street."

Deputy Hilliard then drove appellant to the location where the car was parked, three or four blocks from the school. Deputy Hilliard asked appellant if he had the key. Appellant said it was inside his shoe, which is where Deputy Hilliard recovered it. Deputy Hilliard then checked to be sure the key fit the door of Peracha's car. It did.

Deputy Hilliard took appellant back to school, where the principal asked appellant to write down a statement about the incident. Deputy Hilliard did not ask appellant to make a written statement, and was not "involved in the taking of [appellant's] statement." Deputy Hilliard attached appellant's statement to his arrest report. About one hour elapsed between the time Deputy Hilliard arrived at the middle school and the time he took appellant to the station for booking.

*Defense evidence*

Appellant and his mother, Annette Bowens, testified. Bowens testified that she had "checked [appellant] out of" another middle school that was too permissive, because she was "agitated" by his grades and attendance. She enrolled him in Rogers Middle School, which was near his aunt's house. Appellant spent nights at his aunt's and walked to school in the morning. Bowens picked him up at his aunt's house after school, took him home for dinner and then back to his aunt.

---

[5] A *Gladys R.* questionnaire (*In re Gladys R.* (1970) 1 Cal.3d 855) is given to "arrestees who were 13 years or under when the crime was committed." Its purpose is to determine the minor's capacity to understand the concepts of right and wrong. (*Id*. at pp. 862–867.)

Yarnell had issues with appellant from day one.  When appellant first came to the school, Yarnell told Bowens he dressed like a gang member.  Bowens had received calls from Yarnell and other staff members, including the principal, asking her to bring different clothes for appellant whose clothes were "too coordinated."  When Bowens viewed the surveillance video, she saw only "a tall person with a hooded sweater over the head."  To Bowens, the person in the video seemed older and did not look like her son.

In Peracha's seventh period math class, appellant sat four seats from the teacher's desk.  David, another student in the class, sat two seats in front of appellant.  Appellant testified that on April 20, 2012, David took Peracha's keys and showed them to the class.  On April 25, 2012, Bowens picked appellant up in front of the school at 3:00 p.m., right after his last class.

On April 26, 2012, Deputy Hilliard took appellant out of class and to the principal's office.  Appellant, Deputy Hilliard and the principal were in the office for about 15 minutes.  At first, when Deputy Hilliard asked what happened, appellant said he did not know.  Appellant recalled Deputy Hilliard telling him "we got you.  You're on the video.  We know you took the car," and putting a blank piece of paper in front of him.  Appellant denied taking the car.  He told the principal and Deputy Hilliard that David was involved.  They did not respond, and told him to write a statement.  Deputy Hilliard told him he was lying.  Deputy Hilliard told appellant if he did not write a statement, he would take him to the police station.  Deputy Hilliard also told appellant that when he was done writing, he would let him to go back to class.  Appellant, who had never been interrogated by a police officer before, thought he "had to write" or he would be taken straight to jail.  He wrote a statement that he "made [] up."  Appellant wrote in the statement that he had held the keys for David, but that was a lie.  Appellant was nervous and scared when he wrote the statement.  He "didn't understand," and "just wrote what [he] had to write."

Appellant denied being involved in driving or taking Peracha's car.  He believed David was involved because he showed the keys to the class.  Appellant did not ride with Deputy Hilliard to the car, did not show him the location of the car and Deputy Hilliard never found a key in appellant's shoe.  Like his mother, appellant believed Yandell identified him in the surveillance video because she disliked him.

**DISCUSSION**

*1.      The juvenile court erred when it summarily denied the Pitchess motion seeking discovery as to complaints about Deputy Hilliard's dishonesty*

   *a.      Background*

Before the adjudication, appellant filed a *Pitchess* motion seeking Deputy Hilliard's personnel records.  In pertinent part, that motion sought disclosure of any previous complaints against Deputy Hilliard for false arrest, fabrication of charges and evidence, fabrication of probable cause, dishonesty, writing false reports, and planting evidence.

In support of his *Pitchess* motion, appellant generally denied the allegations against him and, according to his counsel's affidavit, asserted the following plausible factual scenario:

"[Appellant] wrote a statement in [Deputy Hilliard's] presence . . . that [Deputy Hilliard] obtained and took into evidence.  However[,] [appellant] only wrote page one of the confession, none of which is an admission to the crime.  [Appellant] saw [Deputy Hilliard] grab the paper after he wrote the last sentence which was '. . . . so he can drive it home.'  Everything after that was added to the statement and the signature on the second page does not belong to [appellant]."  (Boldface omitted.)

Appellant claimed the incriminating statement, "So I did drive it up the street," and the language that followed was added after Deputy Hilliard took his statement.

In opposition to the *Pitchess* motion, the LASD argued that appellant failed to establish good cause for disclosure because he did not dispute he was the person identified by a nonpolice witness in the school's surveillance video as the person who took Peracha's car, and Deputy Hilliard was not present when that video was taken or the identification made.  Further, the affidavit did not deny either that appellant rode with Deputy Hilliard and pointed out the location of the vehicle, or that appellant gave Deputy Hilliard the key from inside his shoe.[6]

---

[6] The opposition also argued, incorrectly, that appellant acknowledged writing, " I did drive it up the . . . ."  That language follows "'so he can drive it home,'" which are the last words in the statement appellant admits having written.

After a brief hearing, the court found that appellant had failed to establish good cause to conduct an in camera review of the requested records, and denied the *Pitchess* motion. It explained its ruling as follows:

"Well, my understanding of the alleged facts of this case is that [appellant] was seen on some kind of videotape at or around this missing car. And he also gave I believe the police officers the keys to the car. He said somebody else gave it to him, whatever. But I don't believe the fact that he's alleging that the police officer wrote down a false confession, I don't think that's good cause for a *Pitchess* motion. So the *Pitchess* motion will be denied."

*b.      Legal standard and standard of review*

We review a juvenile court's ruling on the *Pitchess* motion for abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

The juvenile court found that because appellant was seen on the video at or near the missing car and gave the key to Deputy Hilliard, there was sufficient evidence he committed the offense independent of his written statement, and denied the motion. That was error. When faced with a *Pitchess* motion, the trial court's task is not to weigh or assess the evidence. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1026 (*Warrick*).) "The trial court does not determine whether a defendant's version of events, with or without corroborating collateral evidence, is persuasive—a task that in many cases would be tantamount to determining whether the defendant is probably innocent or probably guilty." (*Ibid*.) The trial court may not deny a hearing because it believes the evidence supports one factual scenario more than another. On the contrary, if the defendant's alternative scenario is "one that might or could have occurred," the trial court must conduct an in camera hearing. (*Ibid*.)

*Pitchess* established a criminal defendant's limited right to discover police officer personnel records. Its holding has since been codified in Penal Code sections 832.7 and 832.8, which designate such records as confidential, and Evidence Code sections 1043 through 1045, which establish the procedures and standards for obtaining those records in discovery. (*California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1020–1021.) *Pitchess* motions follow a two-step procedure. The defendant files a motion describing the type of records or information sought. (Evid. Code, § 1043, subd. (b)(2).) That request must

8

be supported by "[a]ffidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that the governmental agency identified has the records or information from the records." (Evid. Code, § 1043, subd. (b)(3); *People v. Hustead* (1999) 74 Cal.App.4th 410, 416 (*Hustead*).) The affiant need not have personal knowledge of the matters stated in the declaration, which may be based merely on information and belief. (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 86 (*Santa Cruz*).) A declaration by the defendant's attorney is sufficient. (*Id*. at pp. 86–89; *Warrick, supra*, 35 Cal.4th at p. 1026.) If a sufficient showing is made, the court reviews the documents in camera, and determines whether they have any relevance to issues raised in the current proceedings. (Evid. Code, § 1045; *California Highway Patrol*, at p. 1020.) The good cause requirement means the defendant must demonstrate the relevance of the requested material by providing a "'specific factual scenario'" which establishes a "'plausible factual foundation'" for the allegations of officer misconduct. (*California Highway Patrol*, at p. 1020.) "'The statutory scheme thus carefully balances two directly conflicting interests: the peace officer's just claim to confidentiality, and the criminal defendant's equally compelling interest in all information pertinent to his defense.' [Citation.] The 'relatively relaxed standards' for showing good cause are offset by the protective provisions for in camera review.' [Citation.]" (*Hustead*, at p. 416.)

Appellant made a sufficient threshold showing that the information he sought is material to the case at hand. (*Santa Cruz, supra*, 49 Cal.3d at p. 85; *Hustead, supra*, 74 Cal.App.4th at p. 416.) Appellant claimed that Deputy Hilliard tampered with his one-page statement by adding fabricated incriminating material. It cannot be disputed that the act of tampering with a statement, later attached to a police report, bears on various forms of dishonesty, such as writing false reports, evidence fabrication or planting evidence.

*Hustead, supra*, 74 Cal.App.4th 410 is instructive. The defendant's counsel asserted in his declaration that an officer made material misstatements with regard to his observations, including having fabricated statements about the defendant's allegedly dangerous driving maneuvers. (*Id*. at pp. 416–417.) Counsel's declaration also stated that the defendant denied

9

driving in the manner described in the police report and denied having followed the route described in that report. (*Ibid.*) Further, counsel claimed the officer's character, habits, customs and credibility would be pivotal issues at trial. These allegations were sufficient to establish a plausible factual foundation for an allegation that the officer made false accusations in his report, and demonstrated that the defense would be that defendant had not driven in the manner suggested by the police report, thus the charges against him were unjustified. (*Ibid.*)

Here, as in *Hustead*, *supra*, 74 Cal.App.4th 410, appellant denied the allegations against him. Appellant expressly denied that he wrote any of the incriminating material contained in his statement. In addition, counsel also stated that appellant generally denies the allegations against him, and notes that "none" of the material in the one-page statement appellant concedes having written, constitutes "an admission to the crime." (Boldface omitted.) Appellant's defense was clear: he did not take Peracha's car and never admitted he had. The deputy's character, habit, and custom would be material to appellant's defense. These allegations were minimally sufficient to establish a plausible factual foundation for an allegation of officer misconduct—that Deputy Hilliard tampered with appellant's statement.

The Attorney General relies on *People v. Galan* (2009) 178 Cal.App.4th 6 (*Galan*) to support her contention that appellant's scenario was implausible because it was inconsistent with his admission to Deputy Hilliard, and contradicted other facts in the police report which corroborated the written confession, namely how the car was found and that appellant told Deputy Hilliard the key was in his shoe.

In *Galan*, *supra*, 178 Cal.App.4th 6, the defendant was charged with several counts of assault with a deadly weapon after driving his truck recklessly in an attempt to elude two motorcycle officers. During that pursuit, the defendant several times backed up his truck and drove toward the officers, forcing them to take evasive action to avoid being struck. (*Id.* at p. 9.) During a taped interrogation, the defendant told police "he had 'attempted to elude the motorcycle officers' because he was afraid he would be arrested for driving under the influence." (*Id.* at p. 13.) Galan "also said that on two occasions he . . . stopped, shifted into reverse, 'backed in the officers['] direction,' and [came] 'within close proximity to both motorcycle officers.'" (*Ibid.*) Galan's *Pitchess* motion was denied. In light of the taped

10

statements, the appellate court found that Galan had "failed to present a 'scenario of officer misconduct . . . that might or could have occurred.'" (*Ibid.*, citing *Warrick*, *supra*, 35 Cal.4th at p. 1026.)

*Galan*, *supra*, 178 Cal.App.4th 6 does not assist the Attorney General. There the defendant did not contend that his recorded statement had been tampered with or in any way falsified. Here, in contrast, appellant maintains that Deputy Hilliard falsified his statement by adding incriminating material. That dishonest action, if true, would bear on Deputy Hilliard's credibility with regard to other aspects of the report.

The Attorney General also argues that because the report states it was Yandell, not Deputy Hilliard, who identified appellant, prior incidents of Deputy Hilliard's dishonesty are not relevant to the accuracy of that identification. But Yandell's identification was weak: she acknowledged she saw only part of the person's face in the video,[7] and based her identification of appellant on his African-American hairstyle ("tight little curls"), thin frame and her certainty that of 1,100 children in the school, only appellant carried a Gucci backpack. Further, although Yandell testified that the person she saw in the video had not worn a hoodie, both Deputy Hilliard and Bowens testified that the person they saw in the video near the car wore a hoodie. Peracha, Deputy Hilliard and Bowens were unable to identify appellant as the person in the video. The video was not introduced as an exhibit, and the juvenile court refused defense counsel's request to review it. In any event, appellant denied the accuracy of Yandell's identification when he denied all allegations. If Deputy Hilliard's testimony were impeached based on any prior instances of dishonesty, there is a legitimate question as to whether Yandell's identification would be sufficient to support a true finding that appellant took Peracha's car.

The Attorney General asserts that it does not matter whether appellant wrote anything more in his statement because he "failed to state a non-culpable account of what happened"

---

[7] Although Yandell testified that she saw appellant's face in one camera shot, she was unable to say where, in relation to Peracha's car, that shot was focused. She also testified that she never lost sight of at least some part of the boy.

afterwards. Appellant was not required to provide a "non-culpable account" of events. He denied all allegations. The Attorney General also maintains that in appellant's written statement, he admitted having the teacher's keys at some point and that David told him to drive the car "up the street." That is not quite what the statement says. The statement is not easy to read. To our eyes, however, it appears to state that, at David's instructions, appellant "[held the keys] intill [sic] after school," but then "didn't see [David]." When he saw David "on Monday [appellant] gave them to him then [appellant] told [David] to return them but he said no because he was going to get in trouble. Then [David] was drive [sic] it up the street so [David] can get it after Thurday [sic] school so he can drive it home." None of the portion of the statement appellant acknowledges having written says anything about him having driven the car or about him being told to drive it.

Appellant met the standard for good cause for *Pitchess* discovery. The court abused its discretion in denying the motion based on its determination that an alternative scenario was more plausible. (*Warrick*, *supra*, 35 Cal.4th at p. 1026.)

### c. Remedy

The remedy for a trial court's failure to conduct an in camera *Pitchess* review in situation such as this was established in *People v. Gaines* (2009) 46 Cal.4th 172. The appropriate remedy is "a conditional reversal with directions to review the requested documents in chambers on remand." (*Id*. at p. 180.) "After reviewing the confidential materials in chambers, the trial court may determine that the requested personnel records contain no relevant information." (*Id*. at p. 181.) If so, it shall reinstate the judgment. (*Ibid*.) But, even if the in camera review does reveal relevant information, reversal is not then mandated. It is up to appellant to "demonstrate a reasonable probability of a different outcome had the evidence been disclosed." (*Id*. at p. 182.) If appellant can make that showing, the court must order a new trial; if he cannot, the judgment shall be reinstated. (*Id*. at pp. 181–182; *People v. Moreno* (2011) 192 Cal.App.4th 692, 703.)

12

*2.        Appellant's confession was voluntary and admissible*

*a.        The motion to suppress*

Prior to the adjudication, appellant filed a motion seeking to suppress his written statement. He argued the confession was obtained in violation of *Miranda* because, at the time it was made, he did not knowingly and intelligently waive his right to remain silent or to consult with an attorney prior to a police interrogation, and that he did not understand his *Miranda* waiver. The motion was accompanied by an Evidence Code section 730 evaluation by forensic psychologist, Dr. Nadim Karim. Karim opined that appellant was "generally immature," in that he tended somewhat toward defiance responding to questions and was easily frustrated. Karim also opined that although appellant's general fund of knowledge and use of vocabulary were below average, he had no "difficulty understanding the evaluator's questions. Nor did he have difficulty articulating his responses."

In Karim's opinion, appellant "did not understand his *Miranda* waiver." Appellant thought a right to remain silent meant that "[w]hen a police officer tells you to be quiet, you gotta be quiet." (Italics omitted.) And, although appellant did understand that what he said could be used against him in court, he did not understand that if he could not afford an attorney, one would be appointed for him. He also believed he had to write the statement because the deputy told him to do so, and he was afraid.

*b.        Evidence Code section 402 hearing*

Both Deputy Hilliard and appellant testified. Deputy Hilliard testified that he brought appellant from his class to the principal's office where appellant produced his written statement. The principal and perhaps one other person was present; everyone sat at a table. Deputy Hilliard advised appellant, then 13 years old, of his *Miranda* rights. When doing so, he took "care and [took] his age into consideration." Because of appellant's age, Deputy Hilliard walked appellant through a *Gladys R.* form, and told him, "You don't have to speak with me." Deputy Hilliard believed that appellant understood what Deputy Hilliard had said to him. After hearing the advisements, appellant said, "Okay." In Deputy Hilliard's mind, appellant's "[o]kay" meant he understood his rights, and agreed to speak to him. Deputy Hilliard used the words in the standard *Miranda* advisement. He did not specifically explain to appellant what a

13

judge, attorney or the right to remain silent is. If at any point Deputy Hilliard had believed the boy did not understand the words he was using, he would have stopped and possibly called appellant's parents.

This was appellant's first interrogation by a police officer. At first, appellant testified that when Deputy Hilliard told him his rights, he did not understand him to mean he "could have an attorney in the room right then." He thought it meant he had to "do what [Deputy Hilliard] say." On cross-examination, appellant testified that he understood Deputy Hilliard when he told him he had a right to an attorney, and that if he couldn't afford one, an attorney would be appointed for him. On redirect, appellant said he didn't know what his *Miranda* rights are, and does not know what it means to be "entitled to an attorney."

Appellant thought the right to remain silent meant "to just be quiet."[8] He understood that whatever he said to Deputy Hilliard could be used against him in court, but did not know what "waiver" meant. He thought "rights" meant "actions," i.e., whether you understand the difference between right and wrong.

When Deputy Hilliard asked appellant to "write something," appellant did not believe he had a choice. He thought he had to do what the deputy told him to do. Appellant wrote what he did because he was "nervous" and because Deputy Hilliard told him he was going to take him to jail and not call his mom. However, in questions posed by the juvenile court, appellant also testified that Deputy Hilliard did not threaten him, nor did Deputy Hilliard tell appellant what to say; appellant wrote what he wanted to write. Appellant testified he wrote only half of the first page, up to the word "trouble," and that neither the writing nor the signature on the second page were his.

c.     *Analysis*

The California Supreme Court recently restated the established standard for determining the validity of a juvenile's *Miranda* waiver:

---

**8** On cross-examination appellant testified that he understood all of the *Miranda* warnings.

" . . . [Citation.] . . . [J]uveniles subject to custodial interrogation are adequately protected by the following safeguards.

"First, any custodial confession by a juvenile generally is not admissible if the juvenile did not receive proper advisement of the right to counsel and right to remain silent, or if the juvenile did not knowingly, intelligently, and voluntarily waive such rights. As the Supreme Court has emphasized, 'the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves. "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process."' [Citation.]

"Second, as in the case of an adult's *Miranda* waiver, determining the validity of a juvenile's waiver necessitates inquiry into all the circumstances surrounding a challenged interrogation, including 'the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' [Citation.] Thus, for purposes of waiver determinations, courts must consider a juvenile's state of mind, as well as all other circumstances, including a request for a parent, in order to ascertain whether the juvenile 'in fact knowingly and voluntarily decided to forgo' his or her *Miranda* rights. [Citation.] This approach allows the necessary flexibility for courts 'to take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved.' [Citation.]

"Finally, courts must use "'special care in scrutinizing the record'" to evaluate a claim that a juvenile's custodial confession was not voluntarily given. [Citations.] 'If counsel was not present for some permissible reason when [a juvenile's] admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.' [Citation.] Consequently, even when a juvenile has made a valid waiver of the *Miranda* rights, a court may consider whether the juvenile gave a confession after being "'exposed to any form of coercion, threats, or promises of any kind, [or] trickery or intimidation . . . .'" [Citation.] The constitutional safeguard of voluntariness

15

ensures that any custodial admission flows from the volition of the juvenile, and not the will of the interrogating officers." (*People v. Nelson* (2012) 53 Cal.4th 367, 378–379, fns. omitted.)

"To establish a valid waiver of an accused person's right to counsel and to remain silent, the People must show, by a preponderance of the evidence, that the accused voluntarily, knowingly and intelligently waived such rights. [Citations.]" (*In re Bonnie H.* (1997) 56 Cal.App.4th 563, 577.)

On review of a denial of a motion to suppress a statement obtained in alleged "violation of *Miranda*, we 'defer to the trial court's resolution of disputed facts, including the credibility of witnesses, if that resolution is supported by substantial evidence. [Citation.] Considering those facts, as found, together with the undisputed facts, we independently determine whether the challenged statement was obtained in violation of *Miranda's* rules.' [Citation.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 178.)

Appellant was 13 when interviewed by Deputy Hilliard regarding the events surrounding the theft of Peracha's car. Before initiating the conversation, the deputy advised appellant of his rights under *Miranda* and asked appellant if he understood those rights. Appellant responded that he did. Deputy Hilliard was aware of appellant's age and took it into account when he gave the advisements. This is demonstrated by the fact that he had appellant fill out a *Gladys R.* questionnaire after he was given the *Miranda* advisements and before being questioned. If at any point, Deputy Hilliard believed appellant did not understand him, he would have stopped. Deputy Hilliard did not see appellant display any confusion or lack of comprehension. When Deputy Hilliard reminded appellant that he "didn't have to speak" to him, appellant acknowledged that fact with an affirmative, "Okay." Deputy Hilliard did not tailor the *Miranda* warnings specifically for appellant, nor was he required to do so. "The United States Supreme Court has well observed that the *Miranda* warnings serve a prophylactic purpose [citation] and therefore need not be presented in any 'precise formulation' or 'talismanic incantation.' [Citations.] 'Reviewing courts . . . need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his [or her] rights as required by *Miranda*."' [Citation.]" (*People v. Kelly* (1990) 51 Cal.3d 931, 948–949.)

16

Appellant argues that numerous factors weigh against a finding of waiver. First, his age—appellant was just 13 years old at the time of the interrogation. He was also immature. His vocabulary and "knowledge fund" were below average, and the boy did not understand some basic terms of the *Miranda* advisement. This was also his first brush with the law and he was unfamiliar with the privilege against self-incrimination. Appellant also asserts that the interrogation took place in a coercive setting in the principal's office, in the presence of the principal. (See *J.D.B. v. North Carolina* (2011) __ U.S. __ [131 S.Ct. 2394, 2405, 180 L.Ed.2d 310, 325–326] [police interrogation in schoolhouse setting may be coercive for a young teen].) Moreover, when appellant denied taking Peracha's car, Deputy Hilliard accused him of lying, a potentially coercive technique when used on a child. (See *A.M. v. Butler* (7th Cir. 2004) 360 F.3d 787, 800 [officer's technique of accusing an 11 year old of lying could easily lead a child to "'confess'" to anything].)

Based on the totality of the circumstances, not any one fact, we conclude that appellant's admission was voluntary. Appellant places great emphasis on the fact that he was young and immature, and with somewhat limited intelligence. (See *J.D.B. v. North Carolina*, *supra*, 131 S.Ct. at pp. 2401–2403 [a juvenile's age plays a role in determining whether he understands he is free to leave when interrogated by police].) Although appellant's youth is a factor, his age did not preclude him from understanding and being capable of waiving his rights. (*In re Charles P.* (1982) 134 Cal.App.3d 768, 772 ["worldly" 12-year-old probationer understood his rights and knowingly and intelligently waived them].) The court was not persuaded by Karim's evaluation or any testimony that appellant's age or intelligence impaired his ability to understand and/or waive his *Miranda* rights. (See *People v. Thomas* (2012) 211 Cal.App.4th 987, 1012–1013 [15-year-old murder suspect's confession was voluntary even though a forensic psychologist concluded that he was functioning in the "'mildly mentally retarded range'" and that he suffered from attention deficit and hyperactivity disorder]; *In re Brian W.* (1981) 125 Cal.App.3d 590, 601 [15-year-old boy with an I.Q. of 81 validly waived his *Miranda* rights]; *In re Anthony J.* (1980) 107 Cal.App.3d 962, 965, 969–970 [upholding *Miranda* waiver by a 15 year old who functioned at mental age of an 11 or 12 year old].) Appellant has no known mental illnesses and "did not present with any symptoms of

17

perceptual disturbance." And, notwithstanding Karim's opinion that appellant's "general fund of knowledge and use of vocabulary were below average," the evaluator also believed the boy had no difficulty understanding or articulating responses to questions. Appellant is not a "Special Education Student" at Rogers Middle School,[9] and his reading level had tested at "8" at the time of the incident, a year above his grade in school. Additionally, the record does not indicate that appellant has any physical or mental health issues or was taking any medication. Taken in context, Karim's evaluation tends to show appellant lacked familiarity with *Miranda* phrasing, not that he was unable to understand his rights.

We also disagree that the circumstances of appellant's interview demonstrate coercion. A single deputy questioned defendant, and the questioning took no more than 15 minutes. There is no evidence that appellant was fatigued. (Cf. *People v. Alfieri* (1979) 95 Cal.App.3d 533, 545 [confession of a 17-year-old youth with borderline low intelligence and subsequently psychiatrically diagnosed as highly suggestible after being in custody for 36 hours and interrogated for 20 hours was involuntary].) Appellant did claim that Deputy Hilliard threatened he would go to jail if he did not admit the offense. However, when questioned by the court, appellant testified that Deputy Hilliard had not threatened him. Other than this contradictory testimony, there is no other evidence showing intimidating behavior by Deputy Hilliard. Appellant was not a credible witness. The juvenile court stated that it "disbelieve[d] the minor's testimony. Everything he testified to I disbelieve." Nothing in the record indicates that appellant was emotionally distraught or mentally fatigued during the interview. There is no suggestion that his will was overborne and no evidence Deputy Hilliard was aggressive or domineering. And, as for the written statement, the evidence shows Deputy Hilliard was not involved in taking the sworn statement. Appellant wrote the statement on a form created by

---

[9] He did have an Individualized Education Program (IEP) at a middle school he attended sometime before moving to Rogers, though not the school from which he transferred a few weeks before this incident.

18

the school and provided to him by the principal, while Deputy Hilliard was "in [his] car, in and out, doing [his] paperwork."[10]

Under the totality of the circumstances, we conclude that the trial court did not err in concluding that appellant knowingly, intelligently, and voluntarily waived his *Miranda* rights.

Although he did not raise this issue below, appellant also argues that oral statements he made should also have been suppressed: specifically, he told the deputy: (1) that he took and drove the teacher's car, and (2) where it was parked. When Deputy Hilliard asked appellant if he had the key, he told him it was in his shoe.

Again, the record does not support a finding that appellant was coerced into making these oral statements. Deputy Hilliard spoke to appellant in the principal's office and in the principal's presence during school hours for no more than 15 minutes. That circumstance is "quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." (*Berkemer v. McCarty* (1984) 468 U.S. 420, 438 [104 S.Ct. 3138, 82 L.Ed.2d 317].) During this time, no threats were made, no deceptive tactics were employed and Deputy Hilliard took care to remind appellant that he had no obligation to speak to him. Appellant acknowledged that he understood this by saying, "Okay," before telling the deputy his story. Deputy Hilliard told appellant he had been identified on the school's video surveillance system. After "[a] few moments," appellant admitted to driving the car and parking it a few blocks from school. Even if Deputy Hilliard told appellant he would be going to jail for taking Peracha's car, that statement would be insufficient to render the interrogation coercive. (Cf. *People v. Neal* (2003) 31 Cal.4th 63, 81–85 [investigators made threats and promises, and deliberately violated *Miranda* rights of immature and uneducated defendant who

---

[10] The evidence conflicts on this point. Appellant testified that Deputy Hilliard supplied the declaration sheet and forced him to "write something." Deputy Hilliard testified the principal had appellant fill out the sworn declaration after he returned the boy to school, and that he was not present while he wrote it. We defer to the trial court's resolution of disputed facts where, as here, substantial evidence supports its conclusion. (*People v. Farnam*, *supra*, 28 Cal.4th at p. 178.)

was held incommunicado, and without food, for more than 24 hours].)  This is especially true as appellant never indicated an unwillingness to speak to Deputy Hilliard—appellant never asked to end the interview, and never asked for an attorney or to see his parents.  (*In re Aven S.* (1991) 1 Cal.App.4th 69, 76 ["police interviewers are not obliged to advise a juvenile suspect of a right to speak with parents or have them present during questioning"].)  Given the short duration of the questioning, appellant's rapid confession, and the absence of coercive tactics, the totality of the circumstances supports a conclusion that appellant voluntarily confessed once confronted with evidence of his guilt.

Accordingly, we conclude that the juvenile court did not err in finding that the prosecution demonstrated by a preponderance of evidence that appellant's confession and waiver of his *Miranda* rights were voluntary, and denying the motion to suppress.

*3.      Probation conditions*

Appellant and the Attorney General agree that four probation conditions[11] stated in the February 21, 2013 minute order do not match the juvenile court's oral pronouncement at the dispositional hearing.  They disagree, however, as to the proper remedy.

---

[11] Four probation conditions are at issue:  probation condition No. 16 [do not have any dangerous or deadly weapon in your possession, nor remain in the presence of anyone known to minor to be unlawfully armed]; probation condition No. 21 [do not use or possess narcotics, controlled substances, poisons, or related paraphernalia; stay away from places where persons whom you know to use illegal drugs or substances congregate]; probation condition No. 22 [do not associate with persons known to be users or sellers of narcotics/controlled substances, except with the prior written permission of the probation officer]; probation condition No. 23 [submit to urinanalysis and skin checks as directed by the probation officer to detect the use of narcotics/controlled substances].

Two other conditions included on the minute order were also not among the terms and conditions of probation verbally announced by the court.  They are:  probation condition No. 12 [do not be within one block of any school ground unless enrolled, attending classes, on approved school business, or with school official, parent or guardian]; and probation condition No. 19 [do not drink any alcoholic beverages].  In accordance with our discussion below, the trial court's intention with respect to imposition of these conditions of probation also requires clarification on remand.

20

The general rule is that in cases in which there is a discrepancy between the court's oral pronouncement and the clerk's minute order, and the two cannot be harmonized, the oral pronouncement controls. (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2; *People v. Smith* (1983) 33 Cal.3d 596, 599; *People v. Gabriel* (2010) 189 Cal.App.4th 1070, 1073.) Appellant maintains this rule obtains, and the conditions should be stricken from the minute order. The Attorney General argues that the proper remedy is to remand the matter for resolution by the juvenile court because it is unclear whether the court imposed the challenged conditions after the proceeding under its authority to modify probation conditions, or whether the conditions are the result of clerical error.

A probation order is not a part of the judgment that creates vested rights in the defendant; the trial court retains the authority to revoke, modify, or change the probation order. (*People v. Thrash* (1978) 80 Cal.App.3d 898, 901.) Probation conditions need not be orally pronounced, and probation conditions later imposed by written order are valid, so long as the defendant was or became aware of them. (*In re Frankie J.* (1988) 198 Cal.App.3d 1149, 1154–1155; *Thrash*, at pp. 901–902.)

In both *Frankie J.* and *Thrash* the trial courts included probation conditions in signed written orders but did not orally pronounce the conditions. Here, the juvenile court included the challenged probation conditions in an unsigned written order and failed to orally pronounce them. Appellant was not explicitly aware of the conditions because they were not imposed. The four additional conditions at issue are not mandatory. (See Welf. & Inst. Code, § 729.2 [listing mandatory conditions in cases in which minor remains in parent's physical custody]; Welf. & Inst. Code, § 729.3 [identifying conditions for discretionary urine testing when minor not removed from custody of parent].) None of the conditions bears an apparent relationship to appellant's offense. Three are drug related, and only the prohibition against possession or being in the presence of one in possession of a dangerous or deadly weapon was listed in the probation report.

For many years the trend has been toward requiring that a term or condition of probation explicitly require knowledge on the part of the probationer that he is in violation of the term in order for it to withstand a challenge for unconstitutional vagueness. "[P]robation

21

conditions that implicate constitutional rights must be narrowly drawn" and the knowledge requirement in these circumstances "should not be left to implication." (*People v. Garcia* (1993) 19 Cal.App.4th 97, 102.)  In this case there is no clear indication the court intended to modify its oral probation order by adding the new conditions or that appellant knew about those additional conditions.  Nevertheless, in light of our conditional reversal for the purpose of permitting the trial court to conduct in camera inspection in connection with appellant's *Pitchess* motion, the appropriate remedy is to also permit the court, on remand, to clarify its intended conditions of probation.

## DISPOSITION

The juvenile court is instructed to conduct an in camera inspection of the requested personnel records of Deputy Sheriff Troy Hilliard for relevance. If the court's inspection reveals no relevant information, the juvenile court must reinstate the order of wardship. If the inspection reveals relevant information, the court must order disclosure, allow appellant an opportunity to demonstrate prejudice, and order a new adjudication if there is a reasonable probability the outcome would have been different had the information been disclosed. The juvenile court is further directed to clarify the February 21, 2013 minute order with regard to the imposition of conditions of probation Nos. 12, 16, 19, 21, 22 and 23. In all other respects, the order of adjudication is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, Acting P. J.


CHANEY, J.

23