Filed 8/11/15  People v. Hill CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067415 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVI1200219) |
| BRYAN ROMERO HILL, JR. | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino, John B. Gibson, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, William M. Wood and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

Bryan Hill, Jr., was charged and tried as an adult for his role in a home-invasion robbery.  A jury convicted him of first degree robbery, first degree burglary, and street

terrorism, and made true findings on several special allegations, including a gang enhancement. The trial court sentenced defendant to prison for 25 years to life.

Defendant contends the trial court erred by admitting a statement he made to sheriff's deputies because it was obtained in violation of his *Miranda*[1] rights and was otherwise involuntary. We reject this contention of reversible error. Defendant also contends the trial court erred by admitting a gang expert's opinion testimony elicited in response to questions that were not hypothetical, but rather, referred specifically to defendant's "mindset." We hold he forfeited this challenge by failing to object at trial, and this failure does not constitute ineffective assistance of counsel. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*A.    The Prosecution's Case*

*1.    The Crime*

In 2012, defendant's father (Bryan Hill, Sr.)[2] and his father's girlfriend (Marina Valdez) lived in a house in Victorville with their four children, then ages two to 12. Defendant, then 16 years old, did not live with them.

Valdez testified that about 9:00 p.m. on January 23, 2012, she was home with her four children when defendant rang the doorbell. When Valdez let defendant into the house, he asked, "Where's my dad?" Valdez told defendant his father was not home. Defendant followed Valdez into the kitchen and offered to take out the trash, but Valdez

---

[1]    *Miranda v. Arizona* (1966) 384 U.S. 436.

[2]    Because defendant and his father are both named Bryan, we will refer to defendant as "defendant" and to his father as "Hill."

said no. Defendant then told Valdez he needed to go outside to tell his aunt she could leave. When defendant went outside, Valdez locked the door behind him and called Hill, who asked to speak to defendant. Valdez let defendant back into the house and put him on the phone with his father. Defendant and his father "had words," and defendant left the house. Valdez locked the door behind him and turned on the alarm.

Less than five minutes later, defendant rang the doorbell again. After Valdez unlocked and opened the door, defendant asked if he could use the phone again to call his aunt because she had left. Valdez handed him the phone, and when he appeared to be using it outside the front door, several other men rushed into the house. One of them grabbed Valdez and pushed her down into a sitting position. The man holding down Valdez wrapped duct tape around her head, covering her mouth and eyes, while another man held a gun to the back of her head. Valdez was able to push the tape from her eyes so she could see what was happening. Defendant told Valdez to give him "the keys." Valdez asked defendant why he would do this to her and to his siblings. He responded, "Shut the fuck up. Shut up, Bitch."

Valdez's 12-year-old daughter and 10-year-old son locked themselves in an upstairs bedroom. Valdez heard a person banging on the bedroom door and instructing the children to unlock it. The daughter screamed out the window for help. Neighbors heard the screaming, came outside, and called 911. Defendant and the other men began running out the front door. As defendant fled, he told the man holding the gun to Valdez's head to "[k]ill that bitch." The man fled without killing Valdez. One of the neighbors chased the men until sheriff's deputies arrived.

3

After the men left, Valdez removed the duct tape from her face and ran upstairs to call Hill and check on their children. Sheriff's deputies arrived soon after that. At first, Valdez did not tell the deputies defendant was one of the intruders because she regarded him as a son and did not want him to get in trouble. She eventually revealed his involvement and identified him in a field lineup.

Hill arrived and searched the house to determine if anything was missing. He brought to Valdez's attention that a safe containing over $4,000 cash was missing from under a bed.

Jose Valdivia was one of the neighbors who called 911 and chased the suspects. He initially saw three or four men run out of the house. As he pursued them and described their route to the 911 operator, he saw two more men walking. When the two men heard Valdivia describing them to the operator, they ran in the same direction the other group had run earlier. Valdivia described the men as thin and African American.

Sheriff's deputies encountered five men that matched the descriptions Valdivia provided. The deputies identified four of them as defendant, Milton Harris, Dante Washington, and Je'Vaughn Hall.[3] The deputies produced the men for field lineups and transported them to the Victorville sheriff's station. Valdivia identified all the men in the field lineups, including defendant.

Along the route the fleeing suspects had taken, sheriff's deputies recovered a safe containing a large amount of cash, and a backpack containing a 14-pound "brick" of

---

[3]    A detective later identified the fifth as Walter Macon.

4

marijuana.[4] Deputies also found two loaded handguns (one with the hammer cocked), a loaded submachine gun (with a dent in the round in the chamber, indicating someone attempted to fire the weapon, but the round was defective), a glove, bandanas, a beanie, sweatshirts, and a backpack.

### 2. *Defendant's Statements to Sheriff's Deputies*

Defendant underwent two custodial interrogations at the sheriff's station the night of his arrest. We briefly summarize them here, and discuss them in greater detail in our discussion section.

Deputies David Negron and William Hogan conducted the first interview in the station's briefing room. Negron advised defendant of his *Miranda* rights, and defendant waived them. The interview lasted 20 to 30 minutes and was recorded.

A few hours later, Deputy Travis Randolph interviewed defendant in the conference room at the station. Deputy Hogan was also present. Randolph testified Negron and Hogan informed him they had already advised defendant of his *Miranda* rights, so Randolph did not readvise defendant. Randolph recorded the interview, which lasted approximately 30 minutes.

Jurors listened to the recording of Randolph's interview of defendant.[5] Defendant admitted his involvement in the robbery and described it as having occurred in

---

[4] The record suggests Hill was a marijuana dealer. Valdez denied any knowledge of this.

[5] The recording is not part of the appellate record and it was not transcribed in the reporter's transcript. A pretrial transcript of the recording is included in the clerk's

substantially the same way as Valdez testified. Defendant admitted the submachine gun had been in his backpack. He admitted his accomplices were "gangbang[ers]" from the "Projects" in San Bernardino and claimed (apparently falsely) they were Samoan. Defendant denied being a gang member himself.

       3.     *The Gang Expert's Testimony*

The prosecution's gang expert (Officer Raymond Bonshire) testified about the Little Zion Manor Bloods (Little Zion) criminal street gang, its history, culture, territory, colors and symbols, predicate offenses, and primary criminal activities. Bonshire stated he personally knew four of defendant's accomplices were Little Zion members, and three of them had already been convicted of robbery and gang-related offenses for their roles in the subject robbery.

Bonshire opined defendant was an "associate" of Little Zion—not a "full-fledged member," but someone who is "trusted by the gang" and "[t]ypically" works his way up to full member status by committing crimes and "doing gang business." Bonshire believed defendant aspired to be a full-fledged member. By admitting his role in the robbery to Deputy Randolph, and falsely claiming his accomplices were of Samoan heritage, defendant showed his dedication to the gang and his willingness to do what it takes to become a member. Bonshire stated defendant's willingness to take members of Little Zion to rob his family's home "speaks volumes as to his mindset as far as the gang

transcript, and the parties cite to it in their briefs. Our citations to defendant's statement are to the pretrial transcript.

culture applies," as it shows "he's willing to do whatever it takes to become a member of the gang."

Bonshire testified the gang and its members earn respect by committing violent crimes, which instills fear in the community and increases their ability to operate without hindrance due to fear of retaliation. Because the robbery was violent, occurred outside Little Zion turf, provided the gang with financial gain, and served as a recruitment tool, it benefited the gang and increased its reputation. Bonshire also opined the offense was committed in association with the gang because five members of the gang committed a typical gang-related crime together with defendant.

## B. *Jury Verdict and Sentencing*

Defendant was charged and tried as an adult. (Welf. & Inst. Code, § 707, subd. (d)(1).) The jury convicted him of first degree residential robbery while acting in concert with two or more other people (Pen. Code, §§ 211, 213, subd. (a)(1)(A))[6], first degree burglary with a person present (§ 459), and street terrorism (§ 186.22). The jury found true the special allegations that a principal personally used a firearm during the commission of the robbery (§ 12022.53, subds. (b), (e)(1)), and that defendant committed the robbery and burglary for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further or assist in criminal

---

6      All further statutory references are to the Penal Code.

7

conduct by gang members (§ 186.22, subd. (b)).[7] The trial court sentenced defendant to prison for 25 years to life.

## DISCUSSION

### I. *ADMISSION OF DEFENDANT'S STATEMENT*

Defendant contends the trial court erred by admitting his second interview because his *Miranda* rights were violated and the statement was otherwise involuntary.

### A. *Suppression Hearing*

At the suppression hearing regarding defendant's second interview, Deputy Negron testified he first encountered defendant in the field about 9:30 or 10:00 p.m. Over an hour later, Negron interviewed defendant in the sheriff's station's briefing room. The briefing room was an open area that other deputies may have been passing through during the interview. Negron was wearing his patrol uniform, which included his badge, duty belt, duty weapon, and handcuffs. Negron's partner, Deputy Hogan, was also present during the interview.

Negron testified he began the interview by reading defendant his *Miranda* rights from a department-issued *Miranda* card. After doing so, Negron asked, "Do you understand the rights I just explained to you?" Defendant responded, "Yes." Negron then asked, "With these rights in mind, are you willing to talk to me?" Defendant answered, "Yes." Negron recorded the 20- to 30-minute interview on his belt recorder.

---

7       The trial court had previously granted defendant's motion to strike the allegation that defendant personally used a firearm during the commission of all three counts.

8

Defendant used a false name throughout his interview with Negron. Nevertheless, Negron was aware defendant was a minor and complied with department protocol for handling minors in custody, which includes not leaving defendant alone (or logging any times he is left alone) and allowing him to have a parent present if requested. Negron did not advise defendant he had the right to have a parent present. Negron's interview of defendant was not presented to the jury.

A few hours after Negron finished interviewing defendant, Deputy Randolph (also wearing his patrol uniform) escorted defendant from the briefing room to a conference room. Deputy Hogan was also present. Defendant was not handcuffed when Randolph transported him. Randolph interviewed defendant in the conference room for about 30 minutes and recorded the interview. Randolph relied on Negron and Hogan's representation that they had previously advised defendant of his *Miranda* rights, so Randolph did not readvise him. Randolph did not ask defendant if he wanted an adult present.

Defendant gave Randolph his true name and date of birth. He admitted planning the robbery with his accomplices, who he said were Samoans from the "Projects" in San Bernardino. Defendant said his father was a "crazy person" who "would kill you." Knowing they would have to shoot his father if he was home, defendant planned the robbery for when his father would not be there. Defendant admitted traveling with his accomplices from San Bernardino to Victorville with the submachine gun in his backpack.

9

When defendant began discussing the crime's impact on Valdez, he asked

Randolph not to write down anything about it:

"[Defendant]:            Oh. Anyways. I didn't wanna do my stepmom like that, 'cause like- I (unintelligible) I'll tell you the story."

"Dep. Randolph:      What do you mean you didn't wanna do her like that?"

"[Defendant]:            I'll tell you. The- oh. I didn't really wanna like- like- like have her like scared and shit. How she was scared and sh-"

"Dep. Randolph:      You didn't wanna hurt her."

"[Defendant]:            Yea. She didn't get hurt though. I made sure of that. But uh I did say some crafty shit, though."

"Dep. Randolph:      What did you say?"

"[Defendant]:            I did say some shit that was fucked up."

"Dep. Randolph:      What'd you say?"

"[Defendant]:            No, I ain't about to tell you. (Unintelligible)-"

"Dep. Randolph:      If- if you don't tell me straight-"

"[Defendant]:            (Unintelligible) gonna be for murder (unintelligible). All right, look."

" Dep. Randolph:      How is it for murder if nobody died?"

"[Defendant]:            All right, look, if I tell you this, could you not write it down? Just what I told- just don't put that part (unintelligible)"

"Dep. Randolph:      I haven't written anything down but your name."

"[Defendant]:            I'm saying- I'm saying, but please don't write that part down."

10

"Dep. Randolph:    You're gonna tell me the truth, the whole truth,
                  remember?  That was the deal?"

"[Defendant]:      Yeah.  Yeah.  Yeah, but- but don't write that
                  part down, though."

"Dep. Randolph:    I haven't written anything down."

Randolph did not stop recording the interview.  Defendant then described the robbery in substantially the same way as Valdez testified at trial.

Randolph testified it appeared to him defendant understood the questions asked of him and his answers made sense.  Defendant never asked to stop talking and never asked for an attorney.  Defendant was always awake and during the interview was given water and a cupcake.

Defendant presented no evidence at the suppression hearing.

The trial court found defendant made a knowing, intelligent, and voluntary *Miranda* waiver and ruled defendant's second interview was admissible.

Defendant contends the trial court erred in admitting his statement in light of his age, his "highly unstable childhood," the lack of a *Miranda* readvisement, the lack of any advisement of his right to have a parent present during questioning, and trickery by Deputy Randolph.[8]

---

[8]    The People contend defendant forfeited all but the challenge based on the lack of a second *Miranda* advisement by failing to raise them with the trial court.  We disagree. Defendant's combined trial brief and motions in limine sufficiently preserved the other issues by arguing "children and adolescents are different than adults in fundamental—and constitutionally relevant—ways."

11

*B.      Legal Framework*

" ' "[U]nder the familiar requirements of *Miranda*, . . . a suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent." '  [Citations.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 829.)  "To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary." (*People v. Nelson* (2012) 53 Cal.4th 367, 374-375 (*Nelson*).)

"Determining the validity of a *Miranda* rights waiver requires 'an evaluation of the defendant's state of mind' [citation] and 'inquiry into all the circumstances surrounding the interrogation' [citation]." (*Nelson, supra*, 53 Cal.4th at p. 375.)  "When a juvenile's waiver is at issue, consideration must be given to factors such as 'the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " (*Ibid*.)  "This is not to say that a child's age will be a determinative, or even a significant, factor in every case." (*J.D.B. v. North Carolina* (2011) 131 S.Ct. 2394, 2406.)

"Although a juvenile's request to speak with his parent will normally be construed as an invocation of his Fifth Amendment rights [citation], police interviewers are not obliged to advise a juvenile suspect of a right to speak with parents or have them present during questioning [citations]." (*In re Aven S.* (1991) 1 Cal.App.4th 69, 76.)

12

When a suspect is interrogated on more than one occasion and was advised of, and validly waived, his *Miranda* rights in an earlier interrogation, " '[r]eadvisement is unnecessary where the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver. [Citations.] The courts examine the totality of the circumstances, including the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights.' " (*People v. Pearson* (2012) 53 Cal.4th 306, 316-317.)

In addition to the prophylactic *Miranda* advisement requirements, a confession must be voluntary under all the circumstances. "The test for determining whether a confession was voluntary is whether the questioned suspect's will was overborne at the time he confessed. [Citation.] A confession is involuntary under the federal and state guaranties of due process when it has been extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence. [Citations.] Coercive police activity is a necessary predicate to a finding that a confession was involuntary under both the federal and state Constitutions." (*In re Joseph H.* (2015) 237 Cal.App.4th 517, 534.)

When a court's decision to admit a confession is challenged on appeal, we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of

13

*Miranda* or were involuntary or coerced. (*People v. Lessie* (2010) 47 Cal.4th 1152, 1169 (*Lessie*); *In re Joseph H., supra*, 237 Cal.App.4th at p. 534.)

*C.*     *Analysis*

The record shows defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights. During the first interview, Deputy Negron advised defendant of his rights. Defendant said he understood them and expressly waived them.

While defendant's youth is an important consideration, we do not find him so young as to conclude he was incapable of making a knowing and intelligent waiver of his *Miranda* rights. At 16 years old, he was old enough to be issued a driver's license, reflecting society's recognition that 16-year-old minors are mature enough to understand the responsibilities associated with driving. Also, this was not defendant's first clash with the law. His probation report indicates he admitted to criminal offenses on seven separate occasions between 2008 and 2011, and thus, he "was no stranger to the justice system." (*Lessie, supra*, 47 Cal.4th at p. 1169.) Moreover, here defendant was charged and tried as an adult, and the record does not indicate he ever challenged that treatment. The California Supreme Court has upheld *Miranda* waivers by minors the same age as— and even younger than—defendant. (*Nelson, supra*, 53 Cal.4th at p. 375 [15 years old]; *Lessie, supra*, 47 Cal.4th at p. 1169 [16 years old].)

Nor does defendant's claimed "highly unstable childhood" render his *Miranda* waiver unknowing and unintelligent. First, the evidence defendant cites in support of this argument is not properly before us because it was not before the trial court at the suppression hearing; it was introduced only at trial. (*In re Arturo D.* (2002) 27 Cal.4th

14

60, 77-78, fn. 18 [we examine only the evidence presented at the suppression hearing and ignore additional or contrary evidence adduced at trial].)  Second, even if we were to consider the evidence defendant now cites, much of it is unsupported by the record, or involves speculation.  For example, while defendant's opening brief on appeal asserts "his father kicked [him] out of the house" when he was in seventh grade, the record citation is to Valdez's testimony that defendant merely "stopped living with" her and Hill.  Defendant's assertion that he then "lived in approximately six placement homes in five years" is similarly unsupported.  Likewise, defendant asserts his "educational background is unclear, but his grammar in the transcript of his confession shows him to be ill-educated."  Defendant's grammar aside, we are satisfied from our independent review of the transcript that defendant appeared to understand the questions and provided contextually appropriate responses.  Defendant also asserts his father was a drug dealer, but does not explain how that undermines defendant's ability to make a knowing and intelligent waiver of his *Miranda* rights.  In fact, a child raised by a drug dealer may be *more informed* on how to avoid incriminating himself when dealing with law enforcement.

Defendant concedes he was not entitled to an advisement of his right to have a parent present during questioning and there is no indication he would have exercised this option had he been specifically informed of this right.  Given the totality of the circumstances of defendant's *Miranda* waiver, the lack of this advisement did not render his waiver during the first interview legally inadequate.

15

For these reasons, we conclude defendant's *Miranda* waiver during the first interview was knowing and intelligent. We further conclude the totality of circumstances show readvisement during the second interview was not necessary. The second interview occurred within a few hours of the advisement and waiver, a period far shorter than our Supreme Court has deemed "reasonably contemporaneous." (*People v. Pearson, supra*, 53 Cal.4th at pp. 316-317 [readvisement not required after 27 hours].) The continuity in the identity of one of the interrogators (Deputy Hogan) present during both interviews, the fact both interviews took place in the same facility, and defendant's considerable prior experience with law enforcement procedures satisfies us readvisement was not required.

The record also supports the finding that defendant's statement was voluntary and not the product of coercion. Defendant was not mistreated. His interviews were no longer than 30 minutes each, he was given water and a cupcake, and at times was unrestrained. Nothing in the record suggests any of the deputies threatened defendant in any way, coerced him, or were overbearing.

Defendant's claim his statement was involuntary because Deputy Randolph tricked him by continuing to record the interview after he agreed "not to write anything down" is unpersuasive. As shown by the quoted passage above, the only thing defendant asked Randolph not to write down was the "fucked up" "shit" defendant said to Valdez during the robbery. It was not a blanket request not to document defendant's other admissions. Furthermore, even if Randolph engaged in improper trickery at this point in the interview, any error by the trial court in admitting defendant's second interview was

16

harmless because defendant had by then already largely confessed his role in the robbery to Randolph.

Alternatively, even if the trial court erred by admitting defendant's second interview, the error was harmless beyond a reasonable doubt as there was other overwhelming evidence of defendant's guilt. (*People v. Hensley* (2014) 59 Cal.4th 788, 811 [no prejudice where other evidence independently established facts also established by improperly admitted admission].) Valdez, who had known defendant for 15 years, testified in detail about his role in the robbery. Valdivia, a neighbor who personally knew defendant, also independently identified defendant as being involved. Evidence discovered by sheriff's deputies also supported the credibility of Valdez's description of the robbery. For example, Valdez said one of her assailants wrapped duct tape around her head, and Deputy Randolph found pieces of duct tape with hair matching Valdez's in her home's entryway; Valdez said one of the robbers wore a red bandana over his face, and sheriff's deputies recovered one nearby; and Valdez said a safe was missing from the house, and deputies found it nearby. Further, defendant's gang involvement was independently established by Officer Bonshire's testimony that he personally knew the accomplices were members of Little Zion.

Defendant's claim "[t]here were many problems with [Valdez's] credibility as a witness" does not undermine Valdez's testimony in any important manner. Any such alleged inconsistencies relate only to her denials that there had been a 14-pound brick of marijuana in the house and that Hill was a drug dealer. (See fn. 4, *ante*.) Even giving

17

defendant the benefit of the doubt, these credibility issues have no bearing on *whether* defendant was involved in the robbery, they relate only to *what* he stole.

## II.    *CHALLENGE TO THE GANG EXPERT'S TESTIMONY*

Defendant contends the trial court erred by admitting improper expert opinion on the gang enhancement.  He does not challenge the expert testimony with respect to the street terrorism count.

To prove a gang enhancement under section 186.22, subdivision (b)(1), the People must prove the defendant committed the crime "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."  (§ 186.22, subds. (b)(1) & (e)(2), (11).)  This enhancement "requires both [1] that the felony be gang related and [2] that the defendant act with a specific intent to promote, further, or assist the gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1139.)

Defendant contends Officer Bonshire's expert testimony was improper because it addressed both prongs of the gang enhancement by referring specifically to defendant's conduct and intent rather than to some hypothetical gang member's.

### A.    *Details of Officer Bonshire's Testimony*

In addition to his general testimony about the Little Zion gang, Officer Bonshire provided the following defendant-specific testimony regarding the first prong of the gang enhancement without any objection from defendant's counsel:

"Q:    So what significance does it have to you if your opinion is
        that the defendant Bryan Hill was an associate of Little Zion?

18

What would be the significance that he committed the crimes in this case with members of Little Zion?"

"A:    After reviewing the reports and conducting investigation, I have an opinion that he's aspiring to be a member of the gang, and his association with the other gang members and willingness to commit crimes with them shows his allegiance to the gang."

"Q:    So it is also your opinion that as an associate, he was an individual that, at least at some level, was trusted by members of Little Zion?"

"A:    Yes."

"Q:    And based on that status of being trusted and other members of Little Zion being willing to commit the crimes with Mr. Hill, would you say that he was allowed to participate in those crimes with Little Zion?"

"A:    Yes."

[¶] . . . [¶]

"Q:    And how would the defendant benefit by admitting his involvement [in the charged offenses]?"

"A:    Well, it would benefit him as an associate to the gang in respect to his willingness and his involvement to be with the gang.  He's willing to, you know, 'I committed the crime.' His kind of proud sense of being able to commit the crimes on behalf of the gang to show other gang members, you know, that he's doing what he needs to do to be a member of the gang."

[¶] . . . [¶]

"Q:    Based on your knowledge of the individuals involved in this case, your training and experience, your prior contacts with the individuals involved, the portion of the testimony that you sat through during this trial, do you have an opinion as to whether the crimes in this case were committed for the benefit of, at the direction of, or in association with a criminal street gang?"

19

"A: Yes, I do."

"Q: What is your opinion?"

"A: It's my opinion that they were in the benefit of — the crimes of association, benefit and direction of the gang."

Officer Bonshire concluded his testimony on direct examination with the following defendant-specific opinion regarding the second prong of the gang enhancement:

"Q: What about the fact that based on the defendant's own statements, he was willing to take members of Little Zion Manor Bloods and commit this robbery in the home where his stepmom and four siblings were present at the time? Does that have significance to you?"

"A: Yes."

"Q: What is that significance?"

"A: It would be — the significance would be in my opinion that he's willing to commit crimes against his family on behalf of the gang. His willingness to be a part of this organization or gang so much, that he's willing to commit these crimes against his own family. That speaks volumes as to his mindset as far as the gang culture applies, that he's willing to do whatever it takes to became a member of the gang."

Picking up where Bonshire's direct left off, defense counsel's first question on cross-examination was: "Well, let's start right there, mindset of [defendant] on January 23rd, 2012. That's what you just testified to. You have some opinions and insight into mindset; correct?" After Bonshire answered "Yes," defendant's counsel cross-examined Bonshire extensively—and *exclusively*—on the bases for his opinions regarding defendant's mindset.

20

*B.*     *Legal Framework Regarding Gang Expert Testimony*

"It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation." (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.)  In the context of gang experts, the California Supreme Court has recognized "a difference between testifying about specific persons and about hypothetical persons." (*People v. Vang* (2011) 52 Cal.4th 1038, 1047 (*Vang*).)  The court has expressly approved of opinion testimony about "hypothetical persons," so long as the hypothetical questions are "rooted in the evidence of the case being tried." (*Id.* at pp. 1046-1047.)  The court has suggested that the more "rooted in the evidence" the hypothetical is, the more likely it is to be helpful to the jury. (*Id.* at pp. 1046, 1051.)  The court has not yet addressed the propriety of opinion testimony about "specific persons," but it has stated in dicta that "[i]t appears that in some circumstances, expert testimony regarding the specific defendants might be proper." (*Id.* at pp. 1047, 1048, fn. 4, citing *People v. Valdez* (1997) 58 Cal.App.4th 494, 507 (*Valdez*).)

Failing to object to a gang expert's opinion testimony forfeits the issue on appeal. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 819; *Valdez, supra*, 58 Cal.App.4th at p. 505.)  " 'In requiring an objection at trial, the forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error.' " (*People v. Williams* (2008) 43 Cal.4th 584, 624.)  Appellate courts

21

have the discretion not to treat an issue as forfeited when it presents a pure question of law based on undisputed facts. (*Ibid.*)

*C. Analysis*

As defendant acknowledges on appeal, his "counsel failed to object to the admission of the improper expert testimony." Because the alleged error could have been remedied by an objection at trial, defendant has forfeited the issue. (*People v. Williams, supra*, 43 Cal.4th at p. 624; *People v. Partida* (2005) 37 Cal.4th 428, 434.)

Defendant argues his trial counsel's failure to object constitutes ineffective assistance of counsel. We are not persuaded.

To establish a claim of ineffective assistance of counsel, a defendant must show: (1) trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) the defendant suffered prejudice, that is, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 692-694 (*Strickland*); *People v. Hinton* (2006) 37 Cal.4th 839, 876.)

In examining whether a defendant met his burden on the first prong, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland, supra*, 466 U.S. at p. 689; see *People v. Hinton, supra*, 37 Cal.4th at p. 876.) We will not find ineffective representation "unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.) " 'Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference

22

[citations], failure to object seldom establishes counsel's incompetence.' " (*People v. Williams* (1997) 16 Cal.4th 153, 215.)

This is not a case where counsel's failure to object could not have been supported by a reasonable tactical decision. First, defense counsel could reasonably have assessed that an objection would merely have required the prosecutor to rephrase the questions as hypotheticals that did not refer specifically to defendant. Because those hypotheticals would still have to be "rooted in the evidence of the case being tried" (*Vang, supra*, 52 Cal.4th at p. 1046), counsel could have concluded that requiring the prosecutor to reframe the questions would have had little or no favorable effect on the defense and merely focused the jurors' attention on the testimony. (See, e.g., *People v. Williams, supra*, 16 Cal.4th at p. 215 ["trial counsel may have decided not to object to [informant's] testimony about defendant's fear of gang retaliation because an objection would have highlighted the testimony and made it seem more significant"].)

Second, defense counsel's extensive and exclusive cross-examination of Bonshire regarding the bases for his opinions regarding defendant's mindset suggests counsel may have intentionally refrained from objecting to Bonshire's testimony on direct examination. Defense counsel appears to have made a tactical decision to focus on defendant's mindset to advance the defense theory that defendant was motivated by animus toward his father, not a desire to promote gang activity.

Third, it is not certain that an objection based on the ground that the prosecutor did not use hypothetical questions would have been sustained. Although the *Vang* court did not address the issue, it recognized, citing *Valdez*, that "in some circumstances, expert

23

testimony regarding the specific defendants might be proper." (*Vang, supra*, 52 Cal.4th at p. 1048, fn. 4.) Defendant's counsel may have believed this case, like *Valdez*, was the kind in which expert testimony regarding the specific defendant would be proper and, thus, any objection would have been futile.

Alternatively, even if his counsel's failure to object was deficient, defendant has not met "his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.) Defendant's appellate briefing essentially concedes one predicate of the first prong of the gang enhancement—that he committed the charged offenses "in association with a criminal street gang." (§ 186.22, subd. (b).) Defendant acknowledges he "admitted in his statement to the police that he participated in the robbery," and he "has no quarrel with the admission of" Officer Bonshire's opinions that defendant and his accomplices "were members of Little Zion or associated with the gang." Defendant also admitted in his statement to Deputy Randolph that he knew his accomplices were "gangbang[ers]." Thus, we do not doubt the jury would have reached the same conclusion on the first prong of the gang enhancement.

Defendant focuses on the second prong of the gang enhancement, his "specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b).) He contends that without Officer Bonshire's opinion testimony regarding his specific intent—that his willingness to take members of Little Zion to rob his family's home "speaks volumes as to his mindset"—it is reasonably probable the jury would have

returned a more favorable verdict based on defendant's theory he was motivated by animus toward his father. This argument is unpersuasive for at least two reasons.

First, as discussed above, the practical effect of an objection to the form of the questions would have been to require the prosecutor to rephrase them as hypothetical questions that avoided the use of defendant's actual name. Although Officer Bonshire would have then testified to his opinion of a hypothetical gang member's intent instead of defendant's, we do not believe it is reasonably probable this would have led any juror to arrive at a different result.

Second, there is no reasonable probability the use of hypothetical questions would have caused the jury to accept defendant's family-dynamic theory as his sole motive for the crime. Defendant cites his statement to Deputy Randolph that he had second thoughts about going through with the robbery after he saw his siblings in the house, but decided to go through with it after arguing with his father on the phone: "My dad was like, what the fuck is you doing at my house? You on—you on a warrant and everything. And I was getting mad. And it made me—that made me want to do it." Defendant also said he hated his father for beating him when he was little.

However, defendant seriously contradicted himself during his second interview. He told Randolph he wanted to *back out* of the robbery after talking to his father, but his accomplices—who defendant described as "dangerous" and willing to "kill you, quick"— convinced him otherwise. Defendant also told Randolph he planned the robbery ahead of time so his father would not be home because he knew his accomplices were willing to

25

kill his father. This is why defendant went into the home first, to "test the waters." Defendant also told Randolph he was concerned about Valdez's safety.

Given defendant's statements reflecting concern for his father and family, plus the strong independent evidence of gang involvement, there is no reasonable probability that hypothetical questions would have persuaded a jury to find defendant's sole motivation was animus toward his father and that he had no desire to "promote, further, or assist" gang members. We reject defendant's claim of ineffective assistance of counsel.

DISPOSITION

The judgment is affirmed.

HALLER, Acting P. J.

WE CONCUR:

McINTYRE, J.

O'ROURKE, J.